*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 18-AA-698 and 18-AA-706

FRIENDS OF MCMILLAN PARK and
DC FOR REASONABLE DEVELOPMENT,
PETITIONERS,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION,
RESPONDENT,

and

DEPUTY MAYOR FOR PLANNING AND ECONOMIC DEVELOPMENT and
VISION MCMILLAN PARTNERS, LLC,
INTERVENORS.

On Petitions for Review of an Order of the
District of Columbia Zoning Commission
(ZC Case No. 13-14)

(Argued January 22, 2019　　　　　　　　　　Decided July 3, 2019)

*Andrea C. Ferster* for petitioner Friends of McMillan Park.

*Aristotle Theresa* for petitioner DC for Reasonable Development.

*Philip T. Evans*, with whom *Mary Carolyn Brown* and *Cynthia A. Gierhart* were on the brief, for intervenor Vision McMillan Partners, LLC.

*Caroline S. Van Zile*, Deputy Solicitor General, with whom *Natalie O. Ludaway*, Chief Deputy Attorney General, and *James C. McKay, Jr.*, Senior Assistant Attorney General, were on the brief, for intervenor Deputy Mayor for

Planning and Economic Development.

Karl A. Racine, Attorney General for the District of Columbia, Loren L. AliKhan, Solicitor General, and Richard S. Love, Senior Assistant Attorney General, filed a statement in lieu of brief for respondent District of Columbia Zoning Commission.

Before BLACKBURNE-RIGSBY, Chief Judge, McLEESE, Associate Judge, and RUIZ, Senior Judge.

McLEESE, Associate Judge: Intervenor Vision McMillan Partners, LLC (VMP) seeks to develop a large parcel of land located on the McMillan Reservoir and Filtration Complex. In 2016, this court vacated an order by the Zoning Commission approving VMP's application for a planned unit development (PUD) on the site. Friends of McMillan Park v. District of Columbia Zoning Comm'n (FOMP I), 149 A.3d 1027 (D.C. 2016). On remand, the Commission approved VMP's slightly revised PUD application. Petitioners Friends of McMillan Park (FOMP) and DC for Reasonable Development (DC4RD) challenge the Commission's order. We affirm.

**I.**

As discussed in FOMP I, the McMillan Reservoir and Filtration Complex is listed in the D.C. Inventory of Historic Sites and the National Register of Historic Places. The filtration plant on the site, which used sand to filter drinking water, was

constructed in the early 1900s by the U.S. Army Corps of Engineers and has not been operational since the 1980s. The roughly 25-acre site is rectangular and covers roughly three city blocks. It is crossed by two paved service courts that divide it into three grass-covered open spaces. Each service court contains ten cylindrical structures historically used for sand storage as well as portals and ramps that provide access to subterranean water-filtration cells. Stairs at the corners of the site lead up to a pedestrian path around the perimeter. The landscaping on the site was originally designed by noted landscape architect Frederick Law Olmsted, Jr.

VMP seeks to construct a number of buildings as part of the proposed PUD and to subdivide the site into seven development parcels. Parcel 1, at the north end of the site, is the intended location for a 113-foot-tall medical building. Parcel 6, at the south end, is to be an eight-acre park that includes 6.2 acres of green space and a community-center building. Parcel 7, immediately south of Parcel 1, is to consist of retained and restored historic resources located in the North Service Court. The remaining parcels are to be developed through a combination of mixed-use residential and commercial buildings, one devoted in part to healthcare uses, as well as approximately 146 individual row houses. Altogether, the PUD would create approximately 677 units of new housing. The proposed PUD would preserve and restore a number of the site's above-ground resources, including the regulator

houses, sand storage bins, some portals, and the perimeter path.  It would require demolition, however, of a number of portals and of all but two of the remaining subterranean sand-filter beds.

We vacated the Commission's earlier approval of VMP's proposed PUD in part because we concluded that the PUD contemplated some high-density development -- specifically, the 115-foot medical building then planned for Parcel 1 --  and that the Commission had not adequately explained why the policies advanced by the proposed PUD could not still be advanced if development was limited to medium and moderate density.  *FOMP I*, 149 A.3d at 1033-36.  We found that the Commission had not adequately explained why it had given greater weight to some policies over others.  *Id.* at 1035.  We also found that the Commission had not adequately addressed a variety of potential adverse impacts of the project, including environmental problems, gentrification and displacement, and increased demand for essential public services.  *Id.* at 1036-38.

On remand, the Commission held additional public hearings and received numerous submissions from the public, the parties, and District agencies. Ultimately, the Commission granted VMP's application, as revised, and issued a ninety-six-page order explaining its decision.  The Commission also granted VMP's

request to zone Parcel 1 to the CR Zone District and approved a 113-foot-tall medical building (rather than the 115-foot-tall medical building approved in the Commission's earlier order).

## II.

We must affirm the Commission's order approving the proposed PUD "so long as (1) [the Commission] has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) [the Commission's] conclusions of law follow rationally from those findings." *Howell v. District of Columbia Zoning Comm'n*, 97 A.3d 579, 581 (D.C. 2014) (brackets and internal quotation marks omitted). Because the Commission is an expert body, we generally defer to the Commission's interpretation of the zoning regulations. *Id.* We will not, however, uphold interpretations that are "plainly erroneous or inconsistent with the regulations." *Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 642 A.2d 125, 128 (D.C. 1994) (internal quotation marks omitted).

The PUD process allows the Commission to grant exceptions to otherwise applicable zoning regulations if the proposed PUD offers a "commendable number

or quality of public benefits" and "protects and advances the public health, safety, welfare, and convenience." 11 DCMR § 2400.2 (2015).[1] In deciding whether to approve a proposed PUD, the Commission must weigh "the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects." 11 DCMR § 2403.8 (2015).

The Commission may not approve a proposed PUD that is inconsistent with the Comprehensive Plan, read as a whole, and with other adopted public policies and active programs related to the PUD site. 11 DCMR § 2400.4; *see also* D.C. Code § 6-641.02 (2018 Repl.) (amendments to zoning map may not be inconsistent with Comprehensive Plan). The Comprehensive Plan is a "broad framework intended to guide the future land use planning decisions for the District." *Wisconsin-Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n*, 33 A.3d 382, 394 (D.C. 2011) (internal quotation marks omitted). "[E]ven if a proposal conflicts with one or more individual policies associated with the Comprehensive Plan, this does not, in and of itself, preclude the Commission from concluding that the action would be consistent with the Comprehensive Plan as a whole." *Durant v. District of*

---

[1] The zoning regulations in Title 11 of the District of Columbia Municipal Regulations were amended in 2016. The Commission stated that on matters of substance it would apply the prior regulations to VMP's application and that on matters of procedure it would apply the new regulations. No one has challenged that approach in this court.

*Columbia Zoning Comm'n*, 65 A.3d 1161, 1168 (D.C. 2013). The Comprehensive Plan reflects numerous "occasionally competing policies and goals," and, "[e]xcept where specifically provided, the Plan is not binding." *Id.* at 1167, 1168 (internal quotation marks omitted). Thus "the Commission may balance competing priorities" in determining whether a PUD is consistent with the Comprehensive Plan as a whole. *D.C. Library Renaissance Project/West End Library Advisory Grp. v. District of Columbia Zoning Comm'n*, 73 A.3d 107, 126 (D.C. 2013). "[I]f the Commission approves a PUD that is inconsistent with one or more policies reflected in the Comprehensive Plan, the Commission must recognize these policies and explain why they are outweighed by other, competing considerations." *FOMP I*, 149 A.3d at 1035 (brackets and internal quotation marks omitted).

# III.

We turn first to the arguments of FOMP and DC4RD that the Commission erred by zoning Parcel 1 to the CR Zone District without providing notice or the opportunity to present evidence and argument, as required by the D.C. Administrative Procedure Act (DCAPA). D.C. Code § 2-509(a) (2016 Repl.). We see no basis for reversal on this point.

The parties in contested cases must be given "reasonable notice" of hearings. D.C. Code § 2-509(a). A proceeding to determine a PUD application is a contested case. *Capitol Hill Restoration Soc'y v. District of Columbia Zoning Comm'n*, 287 A.2d 101, 105 (D.C. 1972). Reasonable notice includes notice of the "issues involved" in the hearing, to be provided either in advance of the hearing or "as soon as practicable" if the issues need to be "amend[ed]." D.C. Code § 2-509(a). The parties must be given the opportunity to "present evidence and argument with respect" to the issues. *Id.*

Although VMP had previously requested that other parcels in the proposed PUD be zoned to the CR Zoning District, it was not until after the hearing following the remand in *FOMP I* that VMP requested that Parcel 1 be zoned to the CR Zone District. FOMP and DC4RD argue that they therefore were given neither adequate pre-hearing notice nor an opportunity to present evidence about that specific suggestion. As the Commission noted in its order granting VMP's application, however, FOMP and DC4RD raised no such objection before the Commission. Rather, FOMP responded to VMP's suggestion in a post-hearing letter that raised only legal objections on the merits of the suggestion.

We ordinarily do not decide issues not properly presented to the agency. *E.g.*, *Bostic v. District of Columbia Hous. Auth.*, 162 A.3d 170, 176 (D.C. 2017) ("In the absence of exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative agency at the appropriate time.") (internal quotation marks omitted). More specifically, we have previously declined to reverse agency action based on a claim that the agency failed to give adequate notice and hold a further hearing, where the objecting party failed to object and request such a hearing before the agency. *Office of People's Counsel v. Pub. Serv. Comm'n*, 163 A.3d 735, 742 (D.C. 2017) ("[I]f petitioners believed that further discovery or hearings were necessary, they were obliged to bring that point to the Commission's attention before the Commission ruled . . . .").

The parties debate in this court whether the obligation of reasonable notice required the Commission to provide additional notice and an opportunity to present evidence before zoning Parcel 1 to the CR Zone District. Resolution of that issue would turn on the level of specificity of notice required under § 2-509(a). *See generally Lange v. District of Columbia Bd. of Zoning Adjustment*, 407 A.2d 1058, 1059-60 & n.4 (D.C. 1979) (rejecting claim of inadequate notice where agency based decision on regulation not referred to before hearing, because (1) subject-matter of application should have alerted party to potential applicability of regulation; (2) facts

relating to applicability of regulations arose at hearing; and (3) parties had opportunity to present their interpretations of the regulation).  We need not and do not decide that issue.  Even assuming that the issue is not forfeited because it was not properly raised before the Commission, FOMP and DC4RD have not identified concrete prejudice they suffered as a result of the lack of specific notice.  *See generally, e.g.*, *Transp. Leasing Co. v. Dep't of Emp't Servs.*, 690 A.2d 487, 489 (D.C. 1997) (indicating that lack of notice in administrative proceedings does not warrant reversal where "no prejudice resulted").

The only concrete harm FOMP and DC4RD allege is that the Commission failed to explicitly address a zoning provision applicable to certain healthcare facilities in the CR Zone District.  That provision permits hospitals and clinics in the CR Zone District as special exceptions that can be authorized by the Board of Zoning Adjustment if certain findings are made.  11 DCMR § 606 (2015).  FOMP and DC4RD could have brought that provision to the Commission's attention before the Commission ruled, but they did not do so.  Assuming once again that this point was not wholly forfeited, we see no basis for remanding the case to the Commission on this ground.  The regulations governing PUD approval give the Commission "the option to approve any use that is permitted as a special exception and that would otherwise require the approval of the Board of Zoning Adjustment," and to do so

without applying "the special exception standards normally applied by the Board." 11 DCMR § 2405.7, .8 (2015). By granting the PUD application, the Commission clearly authorized the building of a medical building in the CR Zone District. That decision was within the Commission's authority under the applicable regulations. It may be true, as FOMP argues, that the Commission should ordinarily be explicit when relying on its authority to approve a special use in connection with a proposed PUD. Particularly given that no one brought the issue to the attention of the Commission, however, we are not inclined to remand the matter to the Commission for the Commission to make explicit what is clearly implicit. *See, e.g.*, *Apartment & Office Bldg. Ass'n of Metro. Washington v. Pub. Serv. Comm'n*, 129 A.3d 925, 933 (D.C. 2016) ("remand not required where remand would be pointless because it is apparent the agency would reach the same result") (brackets and internal quotation marks omitted).

## IV.

We turn next to the arguments of FOMP and DC4RD challenging the Commission's ruling on the merits. We note first that the parties extensively debate whether the proposed medical building on Parcel 1 is or is not consistent with Mid-City Area Element 2.6.5 of the Comprehensive Plan, which states that development

on the McMillan site "should consist of moderate- to medium-density housing, retail, and other compatible uses." 10-A DCMR § 2016.9 (2016). We need not decide that issue.

As we explained in *FOMP I*, the Mid-City Area Element is not mandatory. *FOMP I*, 149 A.3d at 1034. Although that provision has "substantial force," it does not "flatly prohibit any high-density development on the site." *Id.* at 1035. The Commission may approve a PUD that is inconsistent with one or more non-mandatory policies in the Comprehensive Plan as long as it "recognize[s] these [conflicting] policies and explain[s] why they are outweighed by other, competing considerations." *Id.* (brackets and internal quotation marks omitted).

The Commission concluded that even if the medical building would be inconsistent with the Mid-City Area Element, that inconsistency was necessary to advance numerous other policies reflected in the Comprehensive Plan that in the Commission's view outweighed the policy as to intensity of use reflected in the Mid-City Area Element. The Commission also concluded that the PUD offered numerous benefits and that any adverse impacts of the PUD could be adequately mitigated. Specifically, the Commission explained that the PUD would advance Comprehensive Plan policies associated with: parks, open space, and recreation;

housing and affordable housing; historic preservation; urban design; maintenance and incorporation of vistas; and public health. The Commission further determined that the PUD would not result in environmental problems, destabilization of land values, or displacement of neighborhood residents, and that any adverse impacts on views, traffic, or public services in the surrounding area were capable of being mitigated. We hold that the critical components of the Commission's analysis were reasonable, supported by substantial evidence, and adequately explained.

## A. City-Wide Policies vs. Site-Specific Policies

FOMP and DC4RD argue that the Commission erred in focusing on general city-wide policies rather than the specific policies governing the McMillan site and, in so doing, gave inadequate weight to the open space and historic resources that would be destroyed by the proposed PUD. Specifically, FOMP and DC4RD rely on 10-A DCMR § 2016.4 to .6, .9, site-specific provisions in the Comprehensive Plan that provide that development of the McMillan site "should . . . pursue[]" policies of (1) requiring that a "substantial contiguous portion of the site" is dedicated to "recreation and open space"; (2) restoring key above-ground elements and exploring "adaptive reuse" of some underground filtration cells, so as to recognize the historic significance of the site; (3) utilizing "moderate- to medium-density housing, retail,

and other compatible uses"; and (4) "maintain[ing] viewsheds and vistas and . . . minimiz[ing] impacts on historic resources."

We conclude that the Commission adequately addressed these policies. It is true, as FOMP and DC4RD point out, this court has cautioned the Commission against "allow[ing] [city-wide and neighborhood] goals to determine the P.U.D. process, at the expense of the site-focused requirements of the regulations." *Blagden Alley Ass'n v. District of Columbia Zoning Comm'n*, 590 A.2d 139, 146 (D.C. 1991). As we previously held in *FOMP I*, however, the site-specific policies on which FOMP and DC4RD rely are not expressed as clear and absolute requirements, but rather are objectives that "*should* be pursued." 149 A.3d at 1034, 1036 (internal quotation marks omitted). Moreover, although site-specific considerations are of course important, the Comprehensive Plan also stresses the importance of other provisions. *See* 10-A DCMR § 300.1, .3 (2016) (Land Use Element of Comprehensive Plan is "the cornerstone of the Comprehensive Plan" and "should be given greater weight than the other elements as competing policies in different elements are balanced"). The Commission in this case relied on several provisions of the Land Use Element as supporting the proposed PUD.

Specifically with regard to historic preservation and open space, the Commission explained that approximately 49% of the area of the PUD will be preserved as open space, including approximately eight acres of parkland. An additional roughly four acres of open space will include some of the site's historic resources such as the Olmsted Walk around the perimeter of the site and the North and South Service Courts with all of their sand storage bins and regulator houses as well as other historic structures. Although portions of only two of the underground cells will be preserved, the Commission explained that the cells set for demolition "are so structurally unstable that they cannot support development" even if it were less intensive development of the sort preferred by FOMP. Moreover, the significant reinforcement needed to stabilize the cells would compromise their historic integrity. Finally, the Commission found that the medical building's visual impact will be at least partially mitigated by open-space buffers to the north and east and that the proposed PUD will preserve views across the southern portion of the site and westwards towards the McMillan Reservoir. The project will also maintain the visual relationship between the Olmsted Walk and the surroundings, and between the two service courts.

In our view, the Commission's analysis of these issues was reasonable and supported by substantial evidence.

## B.  Benefits of Medical Building

In approving the PUD, the Commission relied favorably on the fact that the PUD would create a new medical building.  The Commission explained that the District of Columbia has an aging healthcare infrastructure, the District ranked last in the nation's major metropolitan areas in terms of healthcare facilities per capita, and the PUD site is located in one of nine areas in the District of Columbia designated as Health Professional Shortage Areas.  The Commission found that the proposed medical building would help to address those issues.  *See, e.g.*, 10-A DCMR § 305.10 (2016) (encouraging placement of healthcare facilities on large sites owned by the District of Columbia).

FOMP and DC4RD challenge the Commission's analysis in several respects, but we are not persuaded.  First, pointing out that the McMillan site is right next to the Washington Hospital Center campus, they argue that the Commission failed to give appropriate weight to the Comprehensive Plan's policy of encouraging adequate geographical distribution of healthcare facilities.  10-A DCMR §§ 1105.1, 1106.11-.12 (2016).  In the Commission's view, that policy applies only to public facilities and thus does not apply to the proposed private medical building.  Given

the Commission's findings about the need for healthcare facilities in the area of the McMillan site, however, we need not and do not decide whether the Commission acted reasonably in concluding that the policy of seeking adequate geographical distribution of healthcare facilities applies only to public facilities. Second, citing information not in the record before the Commission, FOMP and DC4RD argue that the shortage of healthcare professionals in the area of the proposed PUD is improving. Our review, however, is limited to the evidence in the administrative record before the agency. *E.g.*, *Lynch v. Masters Sec.*, 93 A.3d 668, 674 n.3 (D.C. 2014). Finally, FOMP and DC4RD argue that there is no evidence that the medical building would provide services targeted to low-income populations. The Commission, however, did not rely on the idea that the medical building would target low-income populations, instead relying more generally on the benefits that could be expected from the addition of a medical building.

## C. Affordable Housing

FOMP and DC4RD argue that the Commission ignored or misapplied policies concerning affordable housing. We find no basis for reversal.

First, FOMP and DC4RD argue that the Comprehensive Plan emphasizes increasing the availability of affordable housing for families, *see* 10-A DCMR §§ 215.9, 500.3, 500.18, 500.21, 505.2, 505.6 (2016), yet the PUD creates mostly studio and one-bedroom units that do not address that need. The Commission reasonably found, however, that the PUD includes at least some affordable townhomes for larger families and that the "substantial" number of other affordable units included in the PUD advance the Comprehensive Plan's policies in favor of increasing affordable housing more generally. *See* 10-A DCMR §§ 305.10, 504.11 (2016).

Second, FOMP and DC4RD argue that the Commission erroneously found that 20% of the total square footage of the proposed PUD's housing would be affordable, when in fact the correct figure is approximately 15%. We agree with VMP and the Deputy Mayor, however, that any error in this calculation was harmless. District law generally requires that developments in the CR Zone District allocate 8% of the gross floor area being devoted to residential use to affordable housing. 11 DCMR § 2603.2 (2015). Reserving approximately 15% of gross floor area is significantly higher than that general requirement. We therefore do not doubt that the Commission would still conclude that a "substantial percentage" of the proposed PUD's housing units have been reserved for affordable housing and would

continue to view that to be an important benefit of the proposed PUD.  We therefore decline to remand to the Commission on this issue.  *See, e.g.*, *Arthur v. District of Columbia Nurses' Examining Bd.*, 459 A.2d 141, 146 (D.C. 1983) ("[R]eversal and remand is required only if substantial doubt exists whether the agency would have made the same ultimate finding with the error removed.").

## D.  Displacement of Residents

FOMP and DC4RD argue that the Commission also committed several errors in its analysis of the issue of possible displacement of current residents as a result of gentrification.  We disagree.

The Commission acknowledged that neighborhoods near the proposed PUD have been seeing increases in land values, home prices, and rents.  Nonetheless, the Commission found that general economic and real-estate-market forces -- in particular, an excess of housing demand relative to supply -- are the primary cause of those increases, rather than individual projects such as the proposed PUD.  In support of this conclusion, the Commission pointed to several studies, including a broad scholarly review of literature on gentrification and displacement, a study of gentrification in Boston, and a more specific Catholic University study of the

District's Bloomingdale neighborhood. The Commission reasoned that the substantial amount of market-rate housing to be constructed as part of the proposed PUD, at a site where there currently is no housing, should logically reduce some of the pressure to construct similar housing in the surrounding neighborhoods and thereby advance the Comprehensive Plan's general policy interest in increasing local housing stock. *See* 10-A DCMR § 309.1 (2016). We view the Commission's discussion of this issue to be reasonable and supported by substantial evidence. We are not convinced by the contentions of FOMP and DC4RD.

First, FOMP and DC4RD argue that the Commission gave inadequate weight to contrary evidence and failed to insist that VMP introduce better evidence on the issue of displacement. That argument is foreclosed by our deferential standard of review. "[W]e will not reweigh the evidence; if there is substantial evidence to support [an agency's] finding, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the [agency]." *Neighbors for Responsive Gov't, LLC v. District of Columbia Bd. of Zoning Adjustment*, 195 A.3d 35, 47 (D.C. 2018) (brackets and internal quotation marks omitted).

Second, FOMP and DC4RD argue that the Commission gave inadequate weight to a report by the D.C. Department of Housing and Community Development (DHCD) stating that the proposed PUD's likely positive effect on property values could "result in housing affordability pressures on renters and property tax pressures on owners, thereby playing a role in residents moving out of the neighborhood." In light of this quoted language, we do not agree with VMP's reading of the DHCD report as concluding that the proposed PUD raised no displacement or gentrification concerns beyond those that currently exist citywide. That said, the DHCD report as a whole is supportive of the proposed PUD. The report notes that the proposed PUD will help create a mixed-income neighborhood and increase homeownership opportunities. The report also notes that because there is nothing currently on the McMillan site, the proposed PUD would cause no direct displacement and would provide a net gain in affordable housing stock. Finally, the report notes the existence of programs that can mitigate the effects of gentrification.

FOMP and DC4RD are correct that the Commission did not discuss the DHCD report at length and did not specifically mention DHCD's statement about the possibility of displacement. We do not, however, find this to be reversible error. *See generally, e.g.*, *Watergate E., Inc. v. Pub. Serv. Comm'n*, 665 A.2d 943, 947 (D.C. 1995) ("If a reviewing court is satisfied that the agency has provided . . . a

reasoned analysis, so that the agency's path may reasonably be discerned, the court will affirm the agency's decision.") (internal quotation marks omitted). After considering all of the evidence on the issue, the Commission reasonably concluded both that the proposed PUD would not cause significant displacement and that any potential adverse effects the proposed PUD might have in this regard could be adequately mitigated.

### E. Economic Feasibility

FOMP and DC4RD argue that the Commission erred in concluding that building a 113-foot-high medical building on Parcel 1 was the only economically feasible way "to retain a substantial part of the property as open space and make the site usable for recreation purposes." *FOMP I*, 149 A.3d at 1036. We do not agree.

The Commission credited the testimony of several VMP witnesses regarding the importance of the medical building and the approximately 860,000 square feet it would provide for high-value healthcare uses. In so doing, the Commission found that the unique below-grade infrastructure at the PUD site requires significant investment as a precursor to any development. The historic-preservation efforts, subsidized affordable housing, and other community benefits included in the

proposed PUD also entail significant costs. Accounting for these costs, while still devoting almost half of the site to parks and open space, requires that some portion of the development be densely clustered. The Commission found that the medical building was necessary to address these issues. Despite occupying a relatively small portion of the PUD site, the medical building and the other planned healthcare building would provide 67% of the nearly $1.2 billion in tax revenue that the PUD was projected to generate over thirty years. Moreover, the Commission credited testimony by VMP's witnesses that outside of healthcare there is no discernable large-scale commercial demand for the site, and that reducing the height of the medical building below 113 feet would make the building unmarketable to healthcare tenants (who require higher minimum floor heights to accommodate specialized equipment).

Based on these findings, the Commission concluded that: (1) the medical building on Parcel 1 is critical to the economic viability of the proposed PUD; and (2) VMP had adequately demonstrated that the building needed to be devoted to healthcare uses. The Commission further concluded that reducing the medical building's height by expanding its footprint (i.e., shifting its density to other portions of the site) would adversely affect the other polices advanced by the proposed PUD such as preserving open space and historical resources.

FOMP and DC4RD argue that the evidence before the Commission on these issues was too conclusory. Specifically, they rely on this court's decision in *Barry Farm Tenants & Allies Ass'n v. District of Columbia Zoning Comm'n*, 182 A.3d 1214 (D.C. 2018), in which the developer submitted more detailed financial information. *Id.* at 1226-27. We did not suggest in *Barry Farm*, however, that the level of financial detail provided in that case was required in that or any other case. *Id.* In the circumstances of this case, and in particular given the absence of contrary evidence requiring greater specificity, we conclude that the Commission reasonably relied on the evidence provided by VMP.

## F. Other Adverse Impacts

Finally, FOMP and DC4RD argue that the Commission failed to obtain adequate information about and to adequately address numerous possible adverse impacts of the proposed PUD, including the impact of the proposed PUD on global warming, ambient noise, public services and utilities, traffic, and a creek that runs through the site. We disagree.

We take as an example the Commission's analysis of possible environmental impacts. In *FOMP I*, we found that the Commission's review of the PUD's environmental impacts was unduly limited. *FOMP I*, 149 A.3d at 1036-38. Specifically, we disagreed with the Commission's conclusion that it did not have to address FOMP's environmental concerns because those concerns could be considered later on as part of the building-permit process. *Id.* at 1036-37. We agreed with FOMP that, under the applicable statutes and regulations, the Commission was obligated to assess environmental impacts before approving a proposed PUD. *Id.* at 1037.

On remand, the Commission adequately fulfilled its obligation to consider possible environmental impacts. The order on remand included more than thirty findings of fact addressing environmental concerns. These findings were based on analyses received from multiple agencies, including: the Department of Consumer and Regulatory Affairs, the Department of Energy and Environment, the District Department of Transportation, the Office of Planning, the Solid Waste Management Administration of the Department of Public Works, and the District of Columbia Water and Sewer Authority. The Commission analyzed and synthesized these findings in its conclusions of law, explaining how it was weighing the evidence it had received from the District's agencies against contrary evidence. In so doing, the

Commission specifically addressed concerns regarding air quality, environmental harm to low-income households, increased vehicle emissions, impacts on wildlife, and noise pollution. The Commission and District agencies undoubtedly could have undertaken an even more extensive investigation into the PUD's potential environmental impacts, but that will always be true. The Commission concluded that VMP had satisfied its burden of showing the PUD will not cause environmental harm. We are satisfied that this conclusion was reasonable and based on substantial evidence. *Cf. generally Wilson Sporting Goods Co. v. Hickox*, 59 A.3d 1267, 1273 (D.C. 2013) ("In administrative proceedings and ordinary life, explanations come to an end somewhere.") (brackets, ellipses, and internal quotation marks omitted).

Without further lengthening this opinion, we note that we reach the same conclusion as to the other potential adverse impacts raised by FOMP and DC4RD: the Commission adequately evaluated potential adverse impacts and reached reasonable conclusions supported by substantial evidence.

In sum, both the Commission's balancing of the Comprehensive Plan policies implicated by the proposed PUD and the Commission's assessment of the possible adverse impacts of the proposed PUD are far more extensive than the analysis we found insufficient in *FOMP I.* 149 A.3d at 1036-38. The Commission's order on

remand sufficiently demonstrates that the Commission identified substantial evidence supporting its factual findings, adequately considered the Comprehensive Plan provisions that were claimed to weigh against approval, rationally concluded that the planned medical building was necessary both to the financial viability of the proposed PUD and to retain a substantial part of the property as open space, sufficiently considered possible adverse impacts of the proposed PUD, and reasonably concluded that on balance the proposed PUD should be approved.

For these reasons, we affirm the Commission's order.

*So ordered.*