*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-217

LORENZ A. WHEATLEY, PETITIONER,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

EYA DEVELOPMENT, LLC, INTERVENOR.

Petition for Review of an Order
of the District of Columbia
Zoning Commission
(ZC-16-17)

(Submitted March 12, 2019                           Decided June 25, 2020)

Lorenz A. Wheatley, *pro se.*

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, were on the brief for respondent.

*Paul A. Tummonds*, *David A. Lewis*, and *Alana V. Rusin* were on the brief for intervenor.

Before THOMPSON, EASTERLY, and MCLEESE, *Associate Judges.*

THOMPSON, *Associate Judge*:    This matter is a petition for review of a September 11, 2017, order (the "Order") of the District of Columbia Zoning Commission (the "Commission") approving an application by EYA Development, LLC, (the "applicant" or the "intervenor") for approval of a planned-unit development ("PUD") and a zoning map amendment affecting the approximately-eight-acre lot (the "Property") located at 1200 Varnum Street, N.E. (the "Project").[1]  The Property is bounded by Allison Street on the north, 12th Street on the west, Varnum Street on the south, and 13th Street and Sargent Road on the east, and is "effectively multiple blocks in size."  The Property currently is owned by St. Joseph's Society of the Sacred Heart, Inc. (the "Josephites") and is the location of that religious order's historic seminary building (the "Seminary"), which sits on the southern half of the Property behind "a magnificent lawn which presents the public face of the Seminary."[2]  The fenced-off northern portion of the Property includes large expanses of open space.  The Josephites, who have owned the Property for nearly a century, have long allowed nearby residents to use the Property's open spaces for recreation.

---

[1]  The Commission's Order approves remapping of the Property to the RA-1 zone, "which is the current designation immediately west of the Property."

[2]  The Seminary is used as a clerical residence for the Josephites and for religious education; it is the primary teaching institution for the Josephites.

A central component of the PUD will be development of the northern portion of the Property to raise funds that will allow the Josephites to remain in the Seminary and continue its use in carrying out their mission. Under the PUD proposal as approved by the Commission, the intervenor would build eighty family-sized, attached and semi-detached single-family townhouses for sale and construct servient streets, alley ways, and parking areas. Ten of the new townhouses would participate in the District of Columbia inclusionary zoning ("IZ") program; four would be reserved for sale to families earning 80% or less of the area's median family income, while six would be reserved for sale to families earning 50% or less of the median family income. The Commission found that the proffered public benefits include, among other things, "superior urban design" and landscaping," historic preservation of the Seminary and associated grounds, provision of three- and four-bedroom townhouses in excess of the amount available as a matter of right and at deeper levels of affordability than is required under the Commission's inclusionary zoning regulations,[3] continuation of the Josephites' social mission, "a robust tree preservation and planting plan in excess of what is required under the applicable regulations," creation of parks and open spaces (including a playground) and maintenance of such areas, transportation infrastructure improvements, a Capital Bikeshare station and reserved car-share

---

[3] *See* 11-C DCMR §§ 1000 – 1008 (as effective in 2017).

parking space, and a contribution of $10,000 to a not-for-profit organization for the administration of property tax counseling to low-income residents living near the Property.

The applicant had modified its proposal in response to community outreach and input (e.g., by cutting the number of townhouses from 150 to 80, increasing the amount of open space to be left on the Property to more than 2.5 acres, and reducing the maximum height of the townhouses from four stories to three stories). Following public hearings on April 27 and May 18, 2017, and after the Commission had received some post-hearing reports and comments for which it had kept the record open, the Commission approved the PUD application in a 161-page ruling.

Petitioner Lorenz A. Wheatley resides on Allison Street, N.E., directly across the street from a row of new townhouses that the intervenor plans to construct at the northernmost end of the Property. Mr. Wheatley objects to the loss of green, open space — what he terms the "key injury" from the PUD — as well as the loss of the Property's low density, "carbon heat sink attributes," peace and quiet, and air quality. He urges this court to reverse the Commission's decision approving the PUD as arbitrary and capricious, not based on substantial evidence,

and inconsistent with the Comprehensive Plan and the zoning regulations. For the reasons discussed below, we affirm the Commission's decision.

## I.

When reviewing an order of the Commission, "we start from the premise that the [Commission's] decision . . . is presumed to be correct, so that the burden of demonstrating error is on the . . . petitioner who challenges the decision." *Union Mkt. Neighbors v. District of Columbia Zoning Comm'n*, 197 A.3d 1063, 1068 (D.C. 2018) (internal quotation marks omitted). We give deference to the Commission's findings, and "[w]e do not reassess the merits of the decision, but instead determine whether the findings and conclusions were arbitrary, capricious or an abuse of discretion, or not supported by substantial evidence." *Wash. Canoe Club v. District of Columbia Zoning Comm'n*, 889 A.2d 995, 998 (D.C. 2005) (internal quotation marks omitted) (explaining that "[s]ubstantial evidence is relevant evidence which a reasonable trier of fact would find adequate to support a conclusion" (internal quotation marks omitted)). "We are not permitted to re-weigh th[e] evidence or [to] substitute our own judgment for that of the agency." *Id.* Accordingly, we "must affirm the Commission's decision so long as (1) it has made findings of fact on each material contested issue; (2) there is substantial

evidence in the record to support each finding; and (3) its conclusions of law follow rationally from those findings." *Howell v. District of Columbia Zoning Comm'n*, 97 A.3d 579, 581 (D.C. 2014) (internal quotation marks omitted).

A PUD application "generally requests that a site be rezoned to allow more intensive development, in exchange for which the applicant offers to provide amenities or public benefits which would not be provided if the site were developed under matter-of-right zoning." *Blagden Alley Ass'n v. District of Columbia Zoning Comm'n*, 590 A.2d 139, 140 n.2 (D.C. 1991) (internal quotation marks omitted). "When evaluating a PUD application, the Zoning Commission is required to 'judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case.'" *Howell*, 97 A.3d at 581 (quoting 11 DCMR § 2403.8 (2015)). "To approve a PUD, the Commission must, among other requirements, find that 'the impact of the project on the surrounding area and the operation of city services and facilities [are not] unacceptable," but instead are "either favorable, capable of being mitigated, or acceptable given the quality of public benefits in the project[.]'" *Union Mkt. Neighbors*, 197 A.3d at 1069 (internal quotation marks omitted).

The Commission's action on a proposed PUD is also subject to the rule that "the PUD process shall not be used . . . to result in action that is inconsistent with the Comprehensive Plan." *Wisconsin-Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n*, 33 A.3d 382, 391 (D.C. 2011) (quoting 11 DCMR § 2400.4 (2015)) (internal quotation marks omitted). The Comprehensive Plan is "a broad framework intended to guide the future land use planning decisions for the District." *Friends of McMillan Park v. District of Columbia Zoning Comm'n*, 211 A.3d 139, 144 (D.C. 2019) (internal quotation marks omitted). "The Commission may not approve a proposed PUD that is inconsistent with the Comprehensive Plan, read as a whole, and with other adopted public policies and active programs related to the PUD site." *Id.* That said, "[t]he Comprehensive Plan reflects numerous occasionally competing policies and goals, and, except where specifically provided, [individual provisions of] the Plan [are] not binding." *Id.* (internal quotation marks and brackets omitted). "It is the Commission that is responsible for balancing the Plan's . . . competing [priorities,] policies and goals, subject only to deferential review by this court." *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1167 (D.C. 2013). Thus, "[e]ven if a proposal conflicts with one or more individual policies associated with the Comprehensive Plan, this does not, in and of itself, preclude the Commission from concluding that the action would be consistent with the Comprehensive Plan as a whole." *Friends*

*of McMillan Park*, 211 A.3d at 144 (internal quotation marks and brackets omitted). "If the Commission approves a PUD that is inconsistent with one or more policies reflected in the Comprehensive Plan, the Commission must recognize these policies and explain why they are outweighed by other, competing considerations." *Id.* (internal quotation marks and brackets omitted).

## II.

Mr. Wheatley challenges the Zoning Commission's decision on a number of grounds, which we discuss in turn.

## A.

Mr. Wheatley contends that the Commission, focusing unduly on the PUD's claimed public benefits, failed adequately to understand and weigh the loss of the existing aesthetic, recreational, and health benefits and amenities that the community is enjoying through the currently undeveloped northern portion of the Property. For the reasons discussed below, we cannot agree that the Commission "ignored" the loss of existing amenities or, as in *Barry Farm Tenants & Allies Ass'n v. District of Columbia Zoning Comm'n*, 182 A.3d 1214 (D.C. 2018),

"fail[ed] to make any findings on the current amenities . . . residents enjoy[.]" *Id.* at 1228.

The Order makes clear that the Commission understood that the Property, including its wide-open northern portion, has been used for recreation over the years and that the Project will entail a "loss of . . . open space[.]" The Commission also acknowledged that green, open space has inherent mental health benefits, that its loss can have resulting adverse mental health consequences, that a loss of neighborhood recreational opportunities as a result of the loss of open space can lead to adverse physical health effects, and that increased density and overcrowding can have adverse physical and mental health effects. The Commission found, however, that the Project's public benefits with respect to health "greatly exceed any adverse health effects[,]" because the Project will result in dedication and preservation of several acres of open space and will "formalize[] that space for community use and recreation." Specifically, the Commission noted that the Project's newly formalized open spaces, including a Neighborhood Green, contemplative garden, new playground, and the great lawn in front of the Seminary ("an area of contemplation and respite for the neighborhood"), will be publicly accessible from dawn until dusk pursuant to an in-perpetuity, recorded, public access easement affecting both the southern and northern sections of the Property,

which will allow both existing neighborhood residents and new townhouse residents to use these spaces. Further, the Commission's Order requires intervenor to file in the land records of the District of Columbia "a covenant and restrictions obligating the [townhouse home owners' association] to maintain the Project's [p]arks for the life of the Project." The Commission judged that the loss of open space on the northern end of the Property is "more than offset[]" by the public access in perpetuity to the open spaces on the southern portion of the Property, which is an essential part of the Project. In taking into account both the development of the northern portion of the Property and the historic preservation and dedication of open space on the Property's southern end, the Commission properly exercised its PUD-process authority to "provide an applicant with some flexibility, . . . in order to allow [the Project] to be developed as a coherent whole[.]" *Durant*, 65 A.3d at 1167.

The Commission likewise did not ignore expressed concerns about loss of the Property's current low density. The Commission found that the density of the residential component of the Project will be comparable to that of the surrounding neighborhood, i.e., comparable to both the "moderate-density and low-density residential designations in the vicinity[,]" and that the zoning map amendment would rezone the Property to an identical zone as one of the adjacent blocks. The

Commission noted that this is in accordance with the Comprehensive Plan guideline (*see* 10-A DCMR § 226.1(h) (as effective in 2017)) that a change in zoning designation affecting a site designated for institutional use should be "comparable" (though not necessarily identical) in density or intensity to designations in the vicinity of the site. The Commission further noted that under its Order, the intervenor is barred from any future use of the "FAR density" for the Property that would otherwise be available under the zoning regulations. In addition, the Commission found that the formal open-space easement is a "considerable public benefit" that warrants the increased density (i.e., clustering of townhouses) on the northern portion of the Property. Specifically, it emphasized that the Project's affordable and family size townhouses, which will address one of the most challenging issues in the District, and the historic preservation of the Seminary are "notable" public benefits that "weigh heavily toward granting such additional density." The Commission concluded that the PUD density is "entirely appropriate" given these public benefits, especially the affordable housing component.

The Commission recognized that as to both of the foregoing amenities — open space and low density — it was called upon to reconcile, and its Order does reconcile, the competing claims to those benefits on the one hand, and the benefit

of new, family-sized, affordable housing on the other. In deciding how properly to weigh those competing Comprehensive Plan goals, which it recognized are "fundamentally at odds[,]" the Commission engaged in the weighing and balancing that is its quintessential function.

The Commission also addressed Mr. Wheatley's concern about loss of the Property's green-space "carbon heat sink attributes[.]"[4] The Commission understood that the Project will entail removal of some large, mature trees on the Property's northern portion, which "[o]pponents rightfully rue[.]" But the Commission credited testimony that because of the planned replacement of trees (the planting of three new trees for every tree that is removed to accommodate the Project) and the applicant's tree preservation plan, there would be "no net loss in tree canopy[.]" That testimony was substantial evidence supporting the Commission's finding that the adverse environmental impact from the loss of trees is capable of being mitigated. Regarding the applicant's design of pitched roofs rather than "green roofs" on the townhouses, the Commission found that the sloped front roofs are designed to hide the townhouses' roof decks from the view of

---

[4] We understand Mr. Wheatley to be referring to the phenomenon or theory that "the removal of any trees or other pre-existing vegetation will reduce the 'carbon sinks' available to absorb carbon dioxide." *Rocky Mountain Farmers Union v. Goldstene*, 719 F. Supp. 2d 1170, 1178 (E.D. Cal. 2010).

neighbors living on the other side of Allison Street. In turn, the roof decks are designed to give townhouse residents a measure of private outdoor space in lieu of backyards that would have consumed the open space that will be used for communal use (e.g., the Neighborhood Green that will be open to townhouse and other neighborhood residents). The Commission also noted the applicant's commitment to install solar-ready roofs and other energy-saving construction and design features for the townhouses.

With respect to the outdoor rooftop decks, Mr. Wheatley also complains that in permitting these decks, the Commission failed to consider the loss of the peaceful characteristics the community currently enjoys. The Commission did not fail to address this concern. It found that the tree canopy, including preservation of the mature tree canopy along 12th St., N.E., will have noise attenuation/absorption benefits and thus will help to mitigate noise concerns. It also found that any adverse noise impacts can be mitigated by enforcement of the District of Columbia's noise regulations. The Commission's approach to the issue is consistent with the Comprehensive Plan provision that calls for "continu[ing] to enforce laws governing maximum day and nighttime [noise] levels for . . . residential land uses[.]" 10-A DCMR § 620.10 (as effective in 2017). In addition, the Commission cited the lack of any evidence that the noise profile of the

proposed development would be different from existing residential uses. It further found that noise impacts from the new residential development "are acceptable in light of the quality of the Project's public benefits[.]" Especially given that the Commission could not have access to actual noise-profile information for the future townhouse residents, we see no reason to disturb its judgment on this point. *Cf. Woodley Park Cmty. Ass'n. v. District of Columbia Bd. of Zoning Adjustment*, 490 A.2d 628, 641 (D.C. 1985) (citing *Lynchburg Gas Co. v. Fed. Power Comm'n*, 336 F.2d 942, 948 (D.C. Cir. 1964), for the proposition that "where proof of certain facts is unavailable or such proof as is available is highly speculative, courts give greater deference to agency expertise").

As to Mr. Wheatley's and other witnesses' expressed concerns about adverse impacts of the Project on air quality, the Commission observed that these concerns are "speculative" and that the opponents raised no concerns that were "particularized with respect to the Project" or even particular to "townhouse developments that include substantial open space preservation components[.]" We are satisfied with the Commission's handling of this issue.

**B.**

Mr. Wheatley next contends that the Commission failed to quantify the benefits the PUD would bring, by which he appears to mean that the Commission did not determine the duration of the Josephites' institutional use of the Seminary;[5] he expresses concern that the Seminary may in the future be converted from institutional use to residential use, **"threatening more overcrowding of this area in time."** He also asserts that the Commission failed to explain how and why facilitating the mission of the Josephites qualifies as a public benefit.

---

[5] To the extent that Mr. Wheatley's point about "quantifying" the benefits from the PUD is a more general complaint, we note that the environmental, social, and other public benefits of a project "do not always lend themselves to direct measurement." *California v. Watt*, 668 F.2d 1290, 1317 (D.C. Cir. 1981). Nonetheless, in balancing benefits against adverse impacts, the Commission employed a number of metrics. For example, in weighing the benefits of the PUD, the Commission compared them to benefits (e.g., the level of IZ units) that would have been either required or lost under a matter-of-right development on the Property. It noted that under a matter-of-right, R-2-zone development of the Property, townhouses would likely not have been clustered on the northern end of the Property as the applicant proposed (meaning, it appears, that the townhouses would instead have been spread across the entire Property to generate the needed revenues), most or all of the Property's publicly accessible open spaces would have been lost, and fewer IZ and three- and four-bedroom townhouses would have been feasible. Thus, the Commission took into account the "different election[s]" the Josephites might have made under a matter-of-right project, "without public benefits in return." It also took into account that those who are most likely to be adversely affected by the Project are also among those who are likely to benefit the most from the Project. In addition, the Commission emphasized that the public benefits accruing from the PUD will be "tangible, quantifiable, measurable, or capable of being completed or arranged prior to the issuance of a certificate of occupancy for the Project."

We think the first of Mr. Wheatley's foregoing arguments overlooks the Commission's finding that the PUD will allow the Josephites "to remain in place and continue serving [their] mission[.]"  In so finding, the Commission implicitly credited the uncontradicted testimony from the Consultor General of the Josephites describing the order's "core mission of serving the African/American community and working for social justice" and explaining that approval of the PUD would allow the Josephites to remain in the community and carry out their mission of service.  That testimony was, of course, no guarantee that the Josephites will never decide to move out of the Seminary and abandon its institutional use.  It was, however, substantial evidence upon which the Commission could find that approval of the PUD was consistent with the Comprehensive Plan goal of sustaining religious facilities and institutional uses as "neighborhood anchors[.]"  *See* 10-A DCMR § 311.8 (as effective in 2017).

Mr. Wheatley's threatened-overcrowding argument also unduly minimizes the constraints on future redevelopment imposed by the various conditions of approval that the Commission specified in its Order.  Among other things, the applicant is required, before the issuance of the first building permit for the Project, to "submit a historic landmark application, seeking historic designation of the Seminary Building and associated grounds, with the District of Columbia Historic

Preservation Office."  As a further condition of approval of the PUD, the applicant is required, before any building permits are issued, to record a covenant in the land records of the District, that "shall bind the [a]pplicant and all successors in title to construct and use the [P]roperty in accordance with this [O]rder, or amendment thereof by the Commission."  Further, and as noted above, the Commission declared that "although the [a]pplicant has not utilized the entirety of the actual FAR density afforded it under the Zoning Regulations[,]" it "is barred from any future use of that FAR."  The Commission sought assurances that the portion of the Property that was shown as undeveloped on the applicant's plans would remain that way, and found that the Project's parks will be protected against future development by the easement.

Mr. Wheatley emphasizes the contradiction between the Commission's statement that the Project's preservation of the Seminary through the historic preservation process will "render[] it ineligible for future redevelopment," and the intervenor's statement in its brief that the Order will prevent future development of the southern portion of the Property unless there is "further review and approval from the Commission, which is a process that would allow for public comment." We need not resolve this inconsistency; it is likely true of *any* project that there could be changes in the future, such as through government action, that affect the

use of a property, but that is not a reason to disturb a PUD approval, like this one, that entails conditions and requirements designed to discourage and impede such change.

Mr. Wheatley also asserts that the Commission failed to explain "what aspects of the [Josephites'] mission actually provide[] benefits to the surrounding community now[.]" Although he does not say so in his briefs on appeal, Mr. Wheatley stated in his testimony before the Commission that the proposed PUD "is against [his] spiritual, moral, and ethical values[,]" and he suggested that support for the proposal and "the benefits th[e] PUD will bring to the Josephite community" implicate the Establishment Clause's prohibition against the government's "favoring any one religion over the other."

Contrary to Mr. Wheatley's argument, the record shows that the Commission amply explained the public benefits of allowing the Josephites to remain on the Property and in the preserved Seminary (and did so in a way that does not implicate their particular religion). To begin with, as the Commission recognized, the Comprehensive Plan calls for "[r]ecogni[tion of] places of worship and other religious facilities as an ongoing, important part of the fabric of the city's neighborhoods" and prescribes "[w]ork[ing] proactively with the faith-based

community . . . to address issues associated with these facilities' . . . operations," so that existing religious facilities "may be sustained[.]" 10-A DCMR § 311.8 (as effective in 2017).[6] The Comprehensive Plan also calls for "[r]ecogni[tion of] the importance of institutional uses" to the character and history of the District of Columbia, 10-A DCMR § 311.7 (as effective in 2017), and the Commission cited the Josephite Seminary's role in contributing "institutional stability to the neighborhood[.]" In addition, the Commission cited the "historic architecture" of the Seminary building, the Josephites' "long history of responsible stewardship of the Property[,]" and the expectation that they will "continue to play a not insignificant role in ensuring the continued beautification and maintenance of green spaces on the Property given their long-vested interest in the neighborhood."

In sum, the Commission could properly regard a proposal that would give the Josephites the means with which to remain in their Seminary, maintain its building and grounds, and continue their social justice mission as providing public benefits that advance the historic preservation and neighborhood stability aims and

---

[6] The Comprehensive Plan recognizes, too, "that places of worship or religious assembly, and some other religious facilities or institutions, are accorded important federal constitutional and statutory protections under the First Amendment" and under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc. 10-A DCMR § 311.8 (as effective in 2017).

other goals of the Comprehensive Plan.[7]  In addition, the Commission recognized that the PUD proposal had support from Advisory Neighborhood Commission 5A, which emphasized that the Josephites "have been good neighbors for almost 100 years," and from neighbors who expressed appreciation for the Josephites' having allowed the public to use the Property for many years and who understood that the Josephites are undertaking the Project "out of self-preservation[.]"  It was not improper for the Commission to consider these factors as weighty ones in its weighing of public benefit.  In sum, we are satisfied that the Zoning Commission "did not abuse its considerable discretion when it exercised its judgment as to how much weight to give this particular benefit" — what might be called a reciprocal good-neighbor policy toward the Josephites in their time of need — "in its overall evaluation of the [PUD] application." *Cathedral Park Condo. Comm. v. District of Columbia Zoning Comm'n*, 743 A.2d 1231, 1248 (D.C. 2000).

**C.**

---

[7]  *See* D.C. Code § 1-306.01(b), (b)(6) (2016) (explaining that "[t]he purposes of the District elements of the Comprehensive Plan" include "[a]ssist[ing] in the conservation [and] stabilization . . . of each neighborhood and community in the District").

Mr. Wheatley further contends that in approving the PUD (which he characterizes as delivering "vastly market-rate 'luxury' housing" "only . . . affordable to wealthy families"), the Commission "veer[ed] away from building an inclusive community per the Comprehensive Plan without explanation." The record does not support this claim.

Mr. Wheatley cites the Comprehensive Plan provision that calls for "work toward a goal that one-third of the new housing built in the city over the next 20 years should be affordable to persons earning 80 percent or less of the [AMI]." 10-A DCMR § 504.7 (as effective in 2017). He contrasts that with the PUD proposal to designate only 10 of the planned 80 townhouse units – 12.5% – as affordable units. However, the Comprehensive Plan does not direct that one-third of *every* project should be affordable housing; projects that involve, for example, replacement subsidized housing units[8] contribute to the one-third goal in a way that permits the Commission to approve other projects that include fewer affordable units but that offer other significant public benefits and promote other Comprehensive Plan goals. Further, while Mr. Wheatley complains that the

---

[8] *See, e.g.*, 65 D.C. Reg. 4216, 4224 (Apr. 13, 2018) (describing a proposed PUD project that will construct 331 units, of which "265 (80.3% of the total) will be affordable").

Project will not deliver low-income housing for those making 30% or less of the areawide median income, that level of income constitutes "'extremely low income'" under the Comprehensive Plan. *See* 10-A DCMR § 504.10 (as effective in 2017).[9] While inclusion of families with extremely low income in new for-sale housing developments in the Upper Northeast neighborhood near the PUD site may well be a worthy goal, the Comprehensive Plan contemplates "a diverse community that includes" "persons of low and very low income as well as those of moderate and higher incomes[,]" 10-A DCMR § 2408.3 (as effective in 2017), and calls for "[e]xpand[ing] housing finance and counseling services for very low-, low-, and moderate-income homeowners," 10-A DCMR § 512.10 (as effective in 2017), making no mention of "extremely low income" families. For these reasons, we cannot conclude that the Commission's approval of the PUD's affordable-housing effected a shift away from the Comprehensive Plan tenet of building inclusive neighborhoods.

---

[9] The Commission's IZ regulations appear to recognize that this level of income may not support financing for for-sale housing units such as the proposed townhouses (a point suggested in the intervenor's brief). 11-C DCMR § 1003.3 (as effective in 2017) requires IZ set asides for households earning up to 60% of the District's median family income for *rental* units, but, for *ownership* units, mandates IZ set asides for households earning up to 80% of the District's median family income.

As this court has previously noted, the stated goals of the Commission's IZ regulations include "mitigat[ing] the impact of market-rate residential development on the availability and cost of housing available and affordable to low- and moderate-income households" and "creat[ing] a stock of housing that will be affordable to low- and moderate-income residents over a long term." *Cole v. District of Columbia Zoning Comm'n*, 210 A.3d 753, 761-62 (D.C. 2019) (internal quotation marks omitted). We therefore disagree with Mr. Wheatley's argument that PUD affordable-housing set asides that exceed the minimum IZ standards – even if "[j]ust barely" – cannot reasonably be treated as a true measure of public benefit. Moreover, in the Commission's view, the "outsized positive benefit" of the PUD with respect to housing is not only its "deeper affordability than is required" under the IZ regulations for matter-of-right development (i.e., its six townhouses that will be affordable at 50% AMI[10] plus four others that will be affordable at 80% AMI), but also the fact that all of the affordable and market-rate units will be family-sized units, some (including some of the affordable units) with four bedrooms. The Commission explained that the District of Columbia faces a

---

[10] Based on the testimony, the Commission found that the price of the 50% AMI townhouses would be approximately $200,000, a price that the Commission found is truly affordable given that the median single-family sales price in the vicinity of the Property is approaching $500,000. We have no basis for second-guessing the Commission's determination.

"considerable shortage of new family-sized housing" and has a "housing crisis" and a "critical need for additional family-sized housing[.]" It found that the "single most significant benefit of the Project" is the number of inclusionary zoning townhouses and the "number of townhouses with bedroom counts that satisfy family needs[,]" which the Commission found will address "one of the most challenging issues" in the District — "the dire shortage of family-sized housing" — without any loss of any current townhouses. "[W]e have no authority to second-guess the Commission's judgment on such policy matters." *Cole*, 210 A.3d at 762 n.12.

Mr. Wheatley argues that the Commission's decision is "capricious" insofar as the decision concludes that the adverse effects of the PUD on "land value destabilization and increases in property taxes" for existing residents will be mitigated by the applicant's commitments. We conclude that the Commission's decision is neither arbitrary nor capricious in its treatment of these issues. The Commission heard testimony from a real estate advisory firm representative describing the results of its study of the land-value-destabilization and displacement aspects of the PUD application. The witness stated that neighborhoods surrounding the PUD site are already experiencing increases in property values and rents without any impetus from the development, and that

there is no reason to believe that the PUD will have any significant impact on that trend. The witness also testified that in light of the imbalance between new-housing supply and demand, new housing (especially affordable housing) is one of the best ways to mitigate price increases. That testimony, which the Commission credited and found was based on a "sound methodology[,]" was substantial evidence supporting the Commission's findings that while gentrification is underway in the neighborhoods around the PUD site, the gentrification impacts of the Project are modest "if extant at all"; and that the most likely outcome of the Project is that it will slow the increase in neighborhood housing prices, in part because it will increase the supply of affordable housing.[11]

The Commission also found that any increases in property taxes in the neighborhood around the PUD will be mitigated by the applicant's proffered contribution to a non-profit organization that will offer housing counseling for existing residents whose property tax burdens increase due to the PUD and who are at risk of losing their homes because of increased property taxes. Mr. Wheatley

---

[11] *Cf. Friends of McMillan Park*, 211 A.3d at 149 ("[T]he Commission found that general economic and real-estate-market forces – in particular, an excess of housing demand relative to supply – are the primary cause of those increases, rather than individual projects such as the proposed PUD . . . . We view the Commission's discussion of this issue to be reasonable and supported by substantial evidence.").

criticizes, as insufficient in duration, any benefits from the intervenor's promise to give $10,000 for housing counseling. But the experienced Commission found that this "novel" approach would be an important supplement to the Tax Relief Fund and the "numerous" other programs to mitigate property tax increases for District of Columbia residents, a number of which were referenced in the hearing testimony. Commissioner May recognized that the contribution was "kind of minimal in some ways," but noted that, per the testimony, it was expected to "actually address . . . the immediate need of people who would be impacted" and "get[] them the kind of help that they need to be able to stay in place." We are satisfied that the Commission had a substantial basis for finding that any adverse property tax impacts of the Project are capable of being mitigated.[12]

### D.

Mr. Wheatley further complains that the Commission approved the PUD application without having received written reports from all "relevant" public

---

[12] For the foregoing reasons, we are unpersuaded by Mr. Wheatley's argument that the absence in the record of a report from the Department of Housing and Community Development (DCHD) "comment[ing] on th[e] . . . Tax Relief Fund and the lack of very low income housing" requires a conclusion that the Commission's Order is legally deficient.

agencies (*see* 11-Z DCMR § 405.3 and 504.2 (as effective in 2017), 11-X DCMR § 308.4 (as effective in 2017), and 11 DCMR § 2403.8 (2015)) and that the Commission relied on agency reports that were conclusory at best. He asserts that the record "contains no sense of existing levels of public services and . . . capacities," a "complete lack of relevant agency review of PUD impacts on existing public services[,]" and no explanation of "who will foot the bill to upgrade and expand the[] [affected] public services as the PUD [P]roject is built[.]"[13]

We will assume *arguendo* that the Commission erred by failing to take adequate steps to obtain written reports from relevant agencies. In light of the various public interests that are at stake in zoning cases, it would ordinarily be difficult to conclude that such an (assumed) error was harmless. In this case,

---

[13] Mr. Wheatley did not raise these objections during his testimony before the Commission or in the letter he submitted to the Commission, but another witness made similar objections. Moreover, in its decision, the Commission rejected the concern that "[t]he District's agencies have not undertaken adequate review of . . . the instant [a]pplication." Accordingly, we address Mr. Wheatley's agency-reports claim. *See York Apartments Tenants Ass'n v. District of Columbia Zoning Comm'n,* 856 A.2d 1079, 1085 n.6 (D.C. 2004) (agreeing that "so long as the [petitioner] or some other party has put an objection on the record, the obligation to exhaust is discharged" and that "[i]t is not always necessary for a party to raise an issue, so long as the Commission in fact considered the issue"; stating also that because "the issues raised by [the petitioner] in this court were raised before the agency, just not by [petitioner,]" the petitioner is not "estopped from presenting its claims to this court") (internal quotation marks and brackets omitted).

however, three factors, taken in combination, lead us to conclude that any such error was harmless and that no remand is required.[14] First, the objection on this topic before the Commission was brief and rather generalized. Second, the Commission did have substantial information — directly or indirectly — about the views of a number of the relevant agencies.[15] Third, to the extent that Mr.

---

[14] *See Apartment & Office Bldg. Ass'n v. Pub. Serv. Comm'n*, 129 A.3d 925, 930 (D.C. 2016) (explaining that "remand is not required in cases where the agency would doubtless reach the same result and reaffirm its prior order").

[15] The record before the Commission included reports or letters from several District of Columbia agencies, including the Department of Transportation ("DDOT"), which submitted initial and supplemental reports addressing traffic and transit issues and containing Urban Forestry Administration comments on tree issues; the Department of Energy and the Environment ("DOEE"), which addressed *inter alia* issues relating to air quality and sewage back-up; D.C. Water, which stated that it would work with the developer to reach a suitable design satisfying the agency's site-development-plan criteria; and the Fire and Emergency Management System ("FEMS"), which expressed "no objection" to the development. Both DOEE and DC Water submitted supplemental reports at the Commission's request. OP reported that it sent the PUD application to other agencies as well, including DCHD, the Department of Parks and Recreation, the Department of Public Works ("DPW"), the D.C. Public Schools ("DCPS"), and the Metropolitan Police Department ("MPD"). In addition, OP held an interagency meeting, during which it heard "positive feedback" from DCHD. OP noted in its report that DCHD also weighed in with respect to the ability of owners of IZ units to recoup the costs of capital improvements to their units at the time of sale. OP also noted that DOEE, DDOT, FEMS, DPW, DC Water, and the Department of Health all review projects as part of the building permit review process. In addition, the PUD application materials made frequent references to the helpfulness of "housing staff" in shaping aspects of the proposal and to a memorandum of agreement with "housing," both references presumably referring to involvement by DCHD and its staff. The Commission found that the applicant met with DCHD and numerous other District agencies. In addition, the

(continued…)

Wheatley's briefs in this court focus on a need for further information on particular topics, the record does not provide specific ground for a concern that any such additional information from District agencies on those topics would have been so adverse as to lead the Commission to deny the PUD application, particularly given the Commission's assessment of the substantial benefits that would arise from the proposed development.

## III.

The Commission's Order sets out in exhaustive detail the bases for its conclusion that the PUD benefits outweigh the adverse impacts and that the PUD is not inconsistent with the Comprehensive Plan. We will not disturb the Commission's weighing and balancing of the evidence. Accordingly, the Commission's Order is

*Affirmed.*

---

(…continued)
Commission heard the applicant's testimony that it consulted with the MPD regarding the design of the playground to facilitate police monitoring.