*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 22-AA-0554 & 22-AA-0571

MERARY VASQUEZ, *et al.*, PETITIONERS,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

PARK VIEW COMMUNITY PARTNERS, INTERVENORS.

On Petition for Review of an Order of
the District of Columbia Zoning Commission
(ZC16-11(2))

(Submitted November 8, 2023)                    (Decided January 25, 2024[*])

*Merary Vasquez, Adam Green, Princess Iyana Goodwin*, *Tonya Williams, Ryan Cummins, Marc Poe, and Shonta' High* were on the brief for petitioners.

*Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Graham E. Phillips*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, were on the brief for respondent.

---

[*] The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment.  It is now being published upon the court's grant of respondent's motion to publish.

*Philip T. Evans*, *Cynthia A. Gierhart*, and *Kyrus L. Freeman* were on the brief for intervenors.

Before EASTERLY, and MCLEESE, *Associate Judges* and THOMPSON, *Senior Judge.*

THOMPSON, *Senior Judge*: This matter is before us on a petition for review of a November 18, 2021, Order on Remand of the District of Columbia Zoning Commission (the "Commission") approving a consolidated planned-unit development ("PUD") application submitted by Park View Community Partners (the "intervenor") and the District of Columbia, and the Commission's June 28, 2022, order denying reconsideration. We first considered this PUD application in *Cummins v. D.C. Zoning Comm'n*, 229 A.3d 768 (D.C. 2020), in which we vacated the Commission's March 2017 initial order approving the PUD and remanded for the Commission to take into account several specified factors, identify record support for its conclusions, analyze the evidence, determine again whether to approve the application, and explain its decision. Petitioners now raise numerous challenges to the Order on Remand. They ask that we vacate the Commission's decision with prejudice. For the reasons discussed below, we affirm the Commission's decision.

## I. Background

The intervenor submitted its PUD application in May 2016, proposing to construct an approximately ninety-foot tall apartment building, an approximately sixty-foot tall building for seniors, and eight townhomes on a lot owned by the District of Columbia that previously housed the Bruce Monroe Elementary School, a public school building that was demolished in 2009. *Cummins,* 229 A.3d at 771-73. The PUD site, which the parties refer to as the "Bruce Monroe site," has been utilized as a temporary community park since that time. *Id.* at 773. A substantial number of the proposed 273 new residential units would be replacement public housing units, a large percentage of the other newly constructed units would be affordable housing units, and the remaining units would be market-rate residential units. *Id.*

In its March 2017 initial decision, the Commission approved the PUD (sometimes referred to hereinafter as the "project") in an order that this court observed was "an over ninety-percent verbatim copy of intervenor's proposed findings of fact and conclusions of law." *Id.* at 775. This court found that the order "did not explicitly identify a single respect in which the PUD as approved would have an adverse effect or would be inconsistent with a policy in the Comprehensive Plan." *Id.* In remanding to the Commission, this court required the Commission to do the following:

(1) take into account that the ninety-foot-high building protrudes into [an area that the Comprehensive Plan's Generalized Policy Map ("GPM") designates as] a Neighborhood Conservation Area [and "explicitly address the implications of the protrusion," *id.* at 777];

(2) take into account that the areas adjacent to the western portion of the PUD are designated moderate-density residential, not medium-density residential [as the March 2017 initial order erroneously stated];

(3) take into account that the ninety-foot-high building and the sixty-foot-high building are not generally consistent with, respectively, the medium-density-commercial and moderate-density-residential designations in the FLUM [Future Land Use Map,] [a factor that "weigh[s] against the proposed PUD . . . when deciding whether the PUD . . . is on balance consistent with the Comprehensive Plan and whether the benefits of the PUD outweigh the PUD's adverse effects," *id.* at 780];

(4) either identify record support for the statement that the senior building "mimics many other apartment houses that have been built as infill developments in the area" or forgo reliance on that consideration;[1]

(5) independently analyze and discuss whether the PUD is inconsistent with specific policies, or would have adverse effects, timely identified before the Commission;[2]

---

[1] The Commission expressly forwent reliance on this consideration in its Order on Remand, so we need not consider the issue here. We do note that the intervenor submitted a schematic depicting several buildings along the Georgia Avenue corridor that its land use expert identified as relevant to the mimicry point.

[2] The Commission interpreted this reference to "timely identified before the Commission" to mean that the Commission was "to reconsider and further explain

(6) determine whether, in light of the Commission's conclusions on these issues, the Commission should grant or deny approval of the PUD; and

(7) explain the Commission's reasoning in granting or denying approval.

*Id.* at 781.

At a post-remand meeting on June 29, 2020, the Commission issued a procedural order requesting that the parties submit written responses to the seven issues identified in the court's opinion. Intervenor, Advisory Neighborhood Commissions 1A & 1B, the Park Morton Residents Council, and Bruce Monroe Park Neighbors all submitted responses. The Commission considered the parties' responses at a meeting on July 26, 2021, and, noting that the Comprehensive Plan had been amended since the Commission first considered the PUD, decided to hold an October 19, 2021, limited-scope public hearing on the effect of the updated Comprehensive Plan on the Commission's consideration of the PUD. On November 18, 2021, upon consideration of the entire record, the Commission again voted unanimously to grant the PUD application. As discussed in further detail below, the Commission found that the proposed PUD is inconsistent with some specific policies of the Comprehensive Plan, but that the PUD is consistent

_____

its decision based on the facts [that had been presented] and regulations in effect at the time it made its original decision." We agree with that interpretation.

with the Comprehensive Plan as a whole. The Commission also identified several adverse impacts of the proposed PUD, explained why they will be fully or partially mitigated, and concluded that the adverse impacts are outweighed by the PUD's benefits. The Commission found that the "most significant benefit" of the PUD is the creation of new housing—"a significantly greater amount of affordable housing and at a much steeper subsidy level" than required by the zoning regulations. Multiple petitioners filed for review of the Order on Remand. We consolidated the petitions for purposes of our review.

## II. Applicable Law

A PUD application "generally requests that a site be rezoned to allow more intensive development, in exchange for which the applicant offers to provide amenities or public benefits which would not be provided if the site were developed under matter-of-right zoning." *Beloved Cmty. All. v. D.C. Zoning Comm'n*, 284 A.3d 728, 732 (D.C. 2022) (quoting *Blagden Alley Ass'n v. D.C. Zoning Comm'n*, 590 A.2d 139, 140 n.2 (D.C. 1991) (internal quotation marks omitted)). "When evaluating a PUD application, the Zoning Commission is required to 'judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case.'" *Howell v. D.C. Zoning Comm'n*, 97 A.3d 579, 581 (D.C. 2014) (quoting 11

D.C.M.R. § 2403.8 (2013)). "To approve a PUD, the Commission must, among other requirements, find that the impact of the project on the surrounding area and the operation of city services and facilities [is not] unacceptable, but . . . instead [is] either favorable, capable of being mitigated, or acceptable given the quality of public benefits in the project[.]" *Union Mkt. Neighbors v. D.C. Zoning Comm'n*, 197 A.3d 1063, 1069 (D.C. 2018) (internal quotation marks omitted).

"The Commission may not approve a PUD that is inconsistent with the Comprehensive Plan," which is "a legislative enactment establishing a broad framework intended to guide the future land use planning decisions for the District." *Cummins*, 229 A.3d at 771 (internal quotation marks omitted). "The Comprehensive Plan reflects numerous occasionally competing policies and goals, and, except where specifically provided, the Plan is not binding." *Id.* (internal quotation marks omitted). "If a PUD implicates conflicting mandatory provisions of the Comprehensive Plan, the Commission may approve the PUD only if the Commission (1) concludes that disregarding one such provision is necessary to comply with one or more other such provisions and (2) explains why it is deciding to favor one such provision over the other such provision." *Id.* (internal quotation marks omitted). "With respect to non-mandatory provisions of the Comprehensive Plan, the Commission may balance competing priorities in determining whether a PUD is consistent with the Comprehensive Plan as a whole." *Id.* (internal

quotation marks omitted). But the Commission may not "simply disregard some provisions of the Comprehensive Plan on the ground that a PUD is consistent with or supported by other provisions of the Comprehensive Plan." *Id.* at 771-72 (internal quotation marks omitted). "Rather, the Commission may approve a PUD that is inconsistent with one or more non-mandatory policies in the Comprehensive Plan only if it recognizes these conflicting policies and explains why they are outweighed by other, competing considerations." *Id.* at 772 (internal quotation marks omitted).

When reviewing an order of the Commission, "we start from the premise that the [Commission's] decision . . . is presumed to be correct, so that the burden of demonstrating error is on the . . . petitioner who challenges the decision." *Union Mkt. Neighbors*, 197 A.3d at 1068 (internal quotation marks omitted). "We do not reassess the merits of the decision, but instead determine whether the [Commission's] findings and conclusions were arbitrary, capricious[,] or an abuse of discretion." *Wash. Canoe Club v. D.C. Zoning Comm'n*, 889 A.2d 995, 998 (D.C. 2005) (internal quotation marks omitted). "Because of the Commission's statutory role and subject-matter expertise, we generally defer to the Commission's interpretation of the zoning regulations and their relationship to the Comprehensive Plan." *Howell*, 97 A.3d at 581 (brackets and internal quotation marks omitted).

We will affirm the "Commission's order approving the proposed PUD so long as (1) the Commission has made findings of fact on each material contested issue; (2) there is substantial evidence in the record to support each finding; and (3) the Commission's conclusions of law follow rationally from those findings." *Friends of McMillan Park v. D.C. Zoning Comm'n (FOMP III)*, 211 A.3d 139, 143 (D.C. 2019) (brackets and internal quotation marks omitted).

When we have remanded a case with specific instructions, we generally will refuse to examine questions outside the scope of the limited remand in a subsequent appeal. *See Majerle Mgmt. Inc. v. D.C. Rental Hous. Comm'n*, 866 A.2d 41, 51 n.18 (D.C. 2004); *see also Briggs v. United States*, 597 A.2d 370, 372 (D.C. 1991) (noting trial court "correctly reject[ed] such an inquiry as beyond the scope of the remand order").

### III. Analysis

Citing *Durant v. D.C. Zoning Comm'n*, 99 A.3d 253 (D.C. 2014), petitioners contend that the Order on Remand is entitled to, in their words, "reduced deference" due to the "lack of careful and independent consideration by the Commission." *See id.* at 257-58 (explaining that we may give the decision of an administrative agency "less deference" where the agency has adopted verbatim the proposed order of one of the parties). We have no occasion to apply "less deference" here. We are advised that neither party submitted a proposed order in

connection with the remand proceedings, and we see no evidence that, in the portions of its Order on Remand responding to our remand instructions, the Commission made verbatim use of any party's submission.[3] We therefore proceed to consider the Order on Remand under our usual deferential standard of review.

**A. Protrusion into a Neighborhood Conservation Area**

As noted above, this court's order in *Cummins* required the Commission to "take into account that the ninety-foot-high building protrudes into a Neighborhood Conservation Area [NCA]," *Cummins*, 229 A.3d at 781, and "explicitly address the implications of the protrusion," *id.* at 777. Petitioners challenge the adequacy of the Commission's analysis with respect to that protrusion.

In its Order on Remand, the Commission acknowledged that a portion of the western side of the PUD site is in an area designated as an NCA and that all of the

---

[3] Petitioners point out that portions of the Order on Remand are taken from the intervenor's proposed findings of fact and conclusions of law that the Commission used verbatim in its order that we vacated in *Cummins*. But some of the passages that petitioners highlight are simply quotes from a letter submitted by the Deputy Mayor for Planning and Economic Development ("DMPED"), and others contain the Commission's description of the PUD site or discussions of PUD benefits, which our remand order did not require the Commission to revisit. We see "no reason to doubt that the Commission's findings and decision [in its Order on Remand] represent its own considered conclusions." *Sheridan Kalorama Hist. Ass'n v. D.C. Bd. of Zoning Adjustment*, 229 A.3d 1246, 1256 (D.C. 2020) (internal quotation marks and brackets omitted).

proposed sixty-foot building and a portion of the proposed ninety-foot building would lie within the NCA. Citing 10-A DCMR § 223.5, the Commission found that the height, density, and character of both proposed buildings (which it observed are "larger in scale and of a different architectural character than the townhouses directly to the north . . . and are larger than the existing development in close proximity on Georgia Avenue") are inconsistent with the policy guidance stating that new development in NCAs "should be compatible with the existing scale and architectural character of each area"[4] and are "mostly inconsistent" with the policy about protecting the low-density character of the area.[5]

The Commission also observed, however, that "the PUD site is unique" and "in several ways does not fit within the conditions and parameters of the NCA described in the Framework Element" of the Comprehensive Plan. That

---

[4] As we have observed with specific reference to elements of the Comprehensive Plan, "[t]he term 'should' often is properly interpreted to suggest or recommend a course of action, rather than to describe a course of action that is mandatory." *Friends of McMillan Park v. D.C. Zoning Comm'n (FOMP I)*, 149 A.3d 1027, 1034 (D.C. 2016) (alterations omitted).

[5] In making this finding, the Commission explained that there are some ways in which the PUD would protect the area's low-density character: the tallest building would be located on the eastern portion of the site (where it abuts the Georgia Avenue commercial corridor), the project density tapers down toward the western (residential) area, and the western edge of the PUD site will include new townhouses and surface parking and circulation, that will reduce the impact on existing townhouses to the west.

observation was well-taken; in pertinent part, the Comprehensive Plan's Citywide Framework Element provides as follows regarding the portions of the GPM designated as NCAs:

> Neighborhood Conservation areas have very little vacant or underutilized land. They are primarily residential in character. Maintenance of existing land uses and community character is anticipated over the next 20 years. Where change occurs, it will be modest in scale and will consist primarily of scattered site infill housing, public facilities, and institutional uses. Major changes in density over current (2005) conditions are not expected but some new development and reuse opportunities are anticipated.

10-A D.C.M.R. § 223.4. *See also* 10-A D.C.M.R. § 223.8 (distinguishing NCAs from Neighborhood Enhancement Areas and noting that NCAs "appear to be 'built out'"). The NCA portion of the PUD site was part of a lot that (before its recent subdivision) was an approximately three-acre, largely vacant lot; it is not and has not been residential in character or "built out"; and redevelopment that will change its existing use as part of a temporary park has long been anticipated.

Finding that the PUD site is "currently underutilized"[6] and is "serving as a temporary park awaiting . . . redevelopment," the Commission reasoned that

---

[6] As we noted in *Cummins*, the Council of the District of Columbia passed resolutions declaring the PUD site to be "surplus." 229 A.3d at 782 (citing D.C. Council Resolution 21-720, Bruce Monroe Surplus Property Declaration Resolution of 2016, 64 D.C. Reg. 431 (2017); D.C. Council Resolution 21-721,

because of the site's "large size, prominent location, and current state, any redevelopment will not be the kind of 'small in scale' development that is contemplated by the NCA." The Commission found that the unique nature of the site "makes it better suited for larger scale redevelopment." The Commission's reasoning appeared to reflect its recognition, discussed elsewhere in the Order on Remand, that the large Bruce Monroe site provides an opportunity for the District to leverage the value of District-owned land to subsidize affordable housing.[7] The Commission therefore concluded that it is acceptable to "allow the more intense development of the type contemplated by the Mixed-Use Main Street Corridor on the eastern side of the PUD site" to extend into the NCA. We accept the Commission's reasoning because it is not arbitrary or capricious. *See Wash. Canoe Club*, 889 A.2d at 998.

---

Bruce Monroe Disposition Approval Resolution of 2016, 64 D.C. Reg. 10453 (2017)).

[7] *See Barry Farm Tenants & Allies Ass'n v. D.C. Zoning Comm'n*, 182 A.3d 1214, 1226-27 (D.C. 2018) (finding a sufficient factual basis for the Commission's approval of a number of housing units that exceeded the number specified in the applicable Small Area Plan because the additional market-rate units were an "economic necessity" to "leverage and allow for the successful development of the replacement public housing and affordable housing units proposed for the PUD" (internal quotation marks omitted)); *see also, e.g.*, 10-A D.C.M.R. § 506.9 (calling for targeting housing-creation efforts to "locations where private sector development interest can be leveraged to assist in revitalization").

The Commission also reasoned that "[t]his kind of 'line blurring' is explicitly contemplated by the Comprehensive Plan" and that the PUD therefore is not inconsistent with the policy guidance of the GPM "considered [holistically]." The Commission further observed that "several references in the Framework Element . . . support the notion that the lines drawn on the GPM . . . are not intended to be interpreted as 'bright lines' but instead are intended to be open to the Commission's interpretation as to where to make appropriate transitions."[8] We defer to the Commission's interpretation that the features of the PUD site are "appropriate circumstances" in which the Comprehensive Plan "explicitly contemplates" that "the PUD process may permit greater height or density," *Union Mkt. Neighbors*, 197 A.3d at 1070 (internal quotation marks omitted); *see also*

---

[8] The Commission cited 10-A D.C.M.R. §§ 223.2 ("Boundaries on the map are to be interpreted in concert with these other sources, [i.e., the Comprehensive Plan text, the FLUM, and other Comprehensive Plan maps] as well as the actual physical characteristics of each location shown") and 226.1 ("The Generalized Policy Map and Future Land Use Map are intended to provide generalized guides for development and conservation decisions.").

Petitioners emphasize that the western portion of the PUD site is still categorized as an NCA on the amended GPM. But as the Commission noted, the amended definition of an NCA states that the NCA designation does "not preclude development, particularly to address city-wide housing needs." And, as OP's witness explained at the October 19, 2021, Commission hearing, "[t]he [FLUM] was changed in th[e] new Comprehensive Plan to make it clear that mixed use medium density[] residential and medium density commercial [are] appropriate for this [PUD] site."

*Howell*, 97 A.3d at 581 (noting our deference to "the Commission's interpretation of the zoning regulations and their relationship to the Comprehensive Plan" (brackets omitted)). And, given that the GPM states in its "Guidelines for Using this Map" that its "boundaries shown should be interpreted as approximate and not precise delineations," we are satisfied that the Commission reasonably interpreted the GPM as not ipso facto precluding non-conforming "protrusions" across GPM lines.

Petitioners argue, however, that the Order on Remand understates the extent to which the proposed apartment buildings are inconsistent with the NCA and out of character with the neighborhood, "greatly understates" the portion of the ninety-foot building that intrudes into the NCA, and fails to analyze the consequences of the intrusion into the NCA. We disagree. The Commission not only repeatedly acknowledged that the height, density, and architectural character of both proposed apartment buildings are inconsistent with the currently existing structures, but also referred to drawings in the record "showing the relationship between the NCA and the 90 foot building" and "the depth of the 'intrusion' of the 90 foot building" into the NCA. As to "consequences" of the protrusion, the Commission acknowledged the "shadow impact" of the proposed apartment buildings on adjacent properties and referred to plans and photographs showing "existing neighborhood conditions," the limited number of existing townhomes (six) on Irving Street that

would directly face one of the proposed new apartment buildings, and the limited number that would abut the west side of the project. We conclude that the Commission adequately took into account the PUD's protrusion into the NCA and the consequences of the protrusion. The number of neighbors in the NCA "living . . . within eyesight of the [proposed ninety-foot building]," a fact emphasized by petitioners, is not a legally relevant test.

Petitioners assert that the effect of the PUD would be "an overpowering contrast of scale, height and density," but we have no basis for accepting that subjective impression over the observation of one of the Commission members quoted in the Order on Remand: that the massing of the proposed PUD "is fitting in." The Commission member's impression is supported by the Commission's observation that "the proposed design orients the higher height and density portion of the Project towards Georgia Avenue, and steps down to relate to the existing lower scale residential neighborhood to the west." In addition, the Commission took notice of the "separation provided by existing and proposed streets, substantial streetscape improvements, and the future public park that will be developed adjacent to the PUD Site." The Commission could reasonably find that these varied features (in the language of a regulation that was in effect at the time the PUD application was submitted) "reduce harsh contrast and improve

compatibility" of the project with the rest of the NCA.  10-A D.C.M.R § 910.17 (2016).

Petitioners also argue that the Commission failed to analyze "the impact on people who specifically moved to the NCA because of the moderate-density 'established neighborhood[.]'"  The record does not actually establish that anyone moved to the neighborhood because it was designated as moderate-density or as an NCA.  But, in any event, the NCA designation does not protect an "established neighborhood" from change; to the contrary, the Comprehensive Plan that was in effect at the time the PUD application was submitted recognized that "[l]imited development and redevelopment opportunities do exist" within NCAs.  *Cummins*, 229 A.3d at 773 (quoting 10-A D.C.M.R. 223.5 (2020)).  Moreover, the Commission noted that the PUD site had been "slated for redevelopment since the Bruce Monroe School was demolished" in 2009 (a fact that "ha[d] been reiterated publicly in the community"), and the Commission repeatedly referred to the Bruce Monroe-site park as an "interim" and "temporary" park, as was indicated in a building permit and solicitation (a signal, to anyone who was actually paying attention to the status of the site, that change was coming).  Indeed, a 2010 article about the "interim park" that petitioners cite states that the "RFP makes it clear the park isn't permanent."

**B. The PUD's Adjacency to Moderate-Density Residential Areas**

On remand, the Commission was also was required to "take into account that the areas adjacent to the western portion of the PUD are designated moderate-density residential, not medium-density residential" on the FLUM, and to "take into account that the ninety-foot-high building and the sixty-foot-high building are not generally consistent with, respectively, the medium-density-commercial and moderate-density-residential designations in the FLUM." *Cummins*, 229 A.3d at 781. In its Order on Remand, the Commission found that "there are several inconsistencies with the FLUM guidance for the [PUD] Site." The Commission acknowledged that a portion of the ninety-foot building extends into the moderate-density residential area on the FLUM, that the sixty-foot building is entirely within the moderate-density residential area on the FLUM, and that both buildings are "taller than the tallest buildings that are described as being typical" for the moderate-density residential category. The Commission also acknowledged that the ninety-foot building is taller than the tallest buildings that are described as being typical for the medium-density residential and moderate-density commercial categories. The Commission emphasized, however, the "dire need for new housing opportunities for all income levels" highlighted in the Mid-City Element of the Comprehensive Plan as well as the "particularly acute" need for affordable housing in the neighborhood of the PUD site. The Commission found that the

proposed PUD "advances many related policies of the Comprehensive Plan and other important policy documents," primarily by "propos[ing] increased height and density on the PUD Site for the specific purpose of providing new housing and affordable housing along the Georgia Avenue commercial corridor, while simultaneously preserving a large portion of the site as open space."[9]  The Commission reasonably found that by providing affordable housing at a level beyond the inclusionary-zoning legal requirements—seventy-four percent of the PUD's 273 residential units will be devoted to public or other affordable housing—the project will provide "a high priority public benefit for the purposes of granting density bonuses" (quoting 11-A D.C.M.R. § 504.15).

The Commission also identified several other Comprehensive Plan policies advanced by the project, including policies described in the Land Use, Transportation, Housing, Environmental Protection, Economic Development, Urban Design, and Mid-City Area Elements.  The Commission concluded that "any potential FLUM inconsistencies" are "overwhelmingly" "outweighed by [the

---

[9] *Cf. FOMP I*, 149 A.3d at 1036 ("[I]f including some high-density development on the site were the only feasible way to retain a substantial part of the property as open space and make the site usable for recreational purposes, then the Commission might be able to permissibly conclude that the need to preserve open space justified the inclusion of some high-density development on the site.").

PUD's advancement of these] other policies."[10]  Citing 10-A D.C.M.R. § 226.1(c), the Commission also noted that policy guidance in the Comprehensive Plan expressly contemplates that "granting of bonus densities" through a PUD "may result in heights that exceed the typical ranges" specified in the GPM and FLUM.[11]

Petitioners contend that the Commission failed to adequately address the FLUM designations because it did not explicitly rebut one petitioner's argument that the ninety-foot building is more properly considered a high-density project. They argue that it was error to approve "a high-density tower in a moderate-density area dominated by 2-story homes."  However, with the Commission having acknowledged that the PUD is inconsistent with the FLUM's guidance, whether

---

[10] Petitioners ask us to reject the Commission's interpretation that "[h]igh quality urban design" is a public benefit even if it does not relate to "turn[ing] a dilapidated structure into a thing of beauty."  We decline to reject the Commission's interpretation, which seems consistent with the Comprehensive Plan's Urban Design Element.  The Urban Design Element, in effect at the time the PUD application was submitted, calls for promoting "higher quality design" and "higher design quality," 10-A D.C.M.R. §§ 916.8, 916.13 (2016), and for "[c]reat[ing] an enhanced design culture in Washington."  10-A D.C.M.R. § 916.9 (2016).

[11] *See also* 10-A D.C.M.R. §§ 504.8 (identifying the "production and preservation of affordable housing for low- and moderate-income households" as a "major civic priority") and 504.15 ("affordable housing . . . shall be considered a high priority public benefit for the purposes of granting density bonuses" when new development is proposed).  The Commission found that the PUD is consistent with these and other "elements of the Comprehensive Plan that encourage the production of quality affordable housing."

the ninety-foot building would be more consistent with a different FLUM designation was not critical. And, in any event, our order remanding the case did not require the Commission to address whether the ninety-foot building is properly considered a high-density project. As we noted in *FOMP III*, "the Mid-City Area Element [of the Comprehensive Plan] is not mandatory" and "does not flatly prohibit any high-density development." 211 A.3d at 146 (internal quotation marks omitted).

We are satisfied that the Commission adequately considered the PUD's inconsistency with the FLUM designations specified in this court's order and adequately explained why the inconsistency was "outweighed by other, competing considerations." *FOMP I*, 149 A.3d at 1035 (internal quotation marks omitted).

### C. Adverse Impacts

Our order in *Cummins* required the Commission to take into account the PUD's inconsistency with FLUM designations when deciding whether the benefits of the PUD outweigh its adverse effects. We also directed the Commission to "independently analyze and discuss whether the PUD is inconsistent with specific policies, or would have adverse effects, timely identified before the Commission." *Cummins*, 229 A.3d at 781. In its Order on Remand, the Commission set out a lengthy discussion of "Project Impacts and Potential Adverse Effects," in which it identified several adverse effects of the project.

We observed in *Cummins* that "placing a ninety-foot-high building across the street from two-story row houses seems clearly in tension with the policy reflected in 10-A DCMR § 309.10 (2020) ('Carefully manage the development of vacant land and the alteration of existing structures in and adjacent to single family neighborhoods in order to protect low density character, preserve open space, and maintain neighborhood scale.')." 229 A.3d at 776. In its Order on Remand, the Commission found that the height and density of the proposed buildings "will create potential adverse effects" on the surrounding rowhouse neighborhood by diminishing light and air, casting shadows, changing the character of the neighborhood, and potentially diminishing privacy. The Commission found that these effects will be partially mitigated by the buildings' setbacks and step-downs, and by the separation effected by Irving Street to the north, by a new private street and townhouses on the western end of the project, by the park that will be preserved at the south end, and by yards, privacy fencing, and ornamental trees that will separate the townhomes from existing residential buildings. As to the proposed density for the PUD site, the Commission found that the density "is appropriate give[n] the public benefits of the [p]roject" and necessary to achieve the Comprehensive Plan policy of providing new housing and affordable housing near the Georgia Avenue corridor. As to the impact of the PUD on the character of the neighborhood, the Commission specifically noted the Office of Planning

("OP") supplemental analysis that while the architecture "does not replicate the early 20th century style of much of the rowhouse neighborhood, . . . it clearly reads as residential in character" with a "human-scaled design." The Commission also found that the PUD design "complements the qualities of the surrounding neighborhood" and "respects the character of the surrounding neighborhood."

The Commission identified the following additional adverse effects of the PUD project: increased traffic demand on surrounding streets, the reduction of available on-street parking in the vicinity of the project, construction noise and pollution, and an increased burden on public services.[12] Regarding increased traffic, the Commission reasonably relied on a traffic impact study[13] that utilized a methodology that the District of Columbia Department of Transportation found to be sound, and that concluded that there would be a "negligible increase in delay to motorists" at the Georgia Avenue/Irving Street intersection (an increase of 1.9

___

[12] The Commission addressed in addition what some opponents of the PUD application testified would be increased water runoff issues in the area and a negative effect of the project on property values. The Commission found that the project will not create adverse or negative effects as to either.

In light of all the Commission's analysis discussed in the text above, we cannot agree with petitioners that the Commission "quickly jump[ed] to claim mitigation without any discussion or analysis of the adverse impacts."

[13] The transportation impact study is part of the record in *Cummins*, No. 17-AA-554. The Commission stated that in approving the PUD again on remand, it "considered the entire record of the case in its deliberations."

seconds) and at the Georgia Avenue/Morton Street intersection (an increase of 3.3 seconds), with the increases in delay due to regional traffic growth and not to the PUD, and that all other intersections surrounding the PUD site, including the intersections at Irving Street and Columbia Road created by the proposed new private street, can be expected to operate at or above the level of service standard.[14] The Commission also cited the area's diverse and robust transportation options noted in the study, the proposed improved pedestrian conditions, and the transportation demand management ("TDM") options that the applicant had agreed to implement to encourage use of non-automobile modes of transportation. Petitioners argue that the Commission did not acknowledge the impact of the PUD on ambulance slowdowns or "specifically apply [its] finding [as to traffic impact] to assess the impact on ambulance response times and public health." We are satisfied, however, that the Commission's discussion of the proposed PUD's impact on traffic in the surrounding area adequately addressed the concern about delayed ambulance response times and that the transportation impact study was substantial evidence supporting the Commission's determination not to treat any

---

[14] DDOT acknowledged that the Georgia Avenue & Irving Street and Georgia Avenue & Morton Street intersections are "projected to . . . remain at failing levels with only minor increases in vehicle delay as a result of the [PUD]."

impact of the PUD on emergency response time as an unacceptable adverse impact.

Regarding parking, the Commission found that the potential "new parking challenges"[15] would be partially mitigated by the TDM measures. Regarding construction noise and pollution, the Commission found that these adverse effects will be adequately mitigated through the applicant's construction management plan, compliance with applicable laws and regulations, and implementation of Enterprise Green Communities standards. Regarding increased burdens on public services ("owing to the number of people that will reside in the Project"), the Commission determined that the burdens are acceptable because the relevant public agencies ("DDOT, DC Water, DOEE, and FEMS") had evaluated the project, identified mitigation measures, lodged no objections, and would work with the applicant during the permitting process to guard against adverse impacts.

Petitioners argue that the Commission failed to acknowledge several adverse-impact issues and thus failed to comply with this court's remand instruction. They identify the "primary adverse-impact" as the "functional

---

[15] The Commission found that these challenges could exist even though the PUD would create below-grade parking spaces within the proposed buildings and new on-street parking on the proposed private street, and noted testimony that the challenges are partially attributable to the District's proposal to create dedicated bus lanes on Irving Street and Columbia Road.

destruction of a park that is the centerpiece of the Park View community." They highlight that the park is located in an area that the Commission acknowledged has a "severe shortage of parkland." Petitioners are correct that the Commission did not include loss of the current park in its list of adverse effects of the PUD. However, we disagree that the Commission failed to acknowledge the loss of park space; it specifically referred to "the community's priority to maintain park and recreation use on the PUD Site," and it acknowledged that the development of housing on the site "will result in the net reduction of open space currently on the PUD Site." The Commission also credited testimony that the site "was never intended to remain a park in its entirety," thus acknowledging the reduction of park space. Further, Commissioners recognized that "people are lamenting the loss of all that open space" (and petitioners' brief twice acknowledges the Commission Chair's statement at a 2016 hearing that concerns about the park "came across loud to [him]"). In addition, the Commission acknowledged that the Mid-City area, where the PUD site is located, is the densest part of the District and has many young children, such that the area's recreational needs "are among the highest in the District."

The Commission further acknowledged that the Comprehensive Plan encourages the preservation of open space, but found that the PUD is consistent with that goal "based on the District's commitment to develop approximately

44,000 square feet of land adjacent to the PUD Site" ("approximately one acre") "in perpetuity" "as a public park." That park-space-in-perpetuity commitment is a condition of the Commission's approval of the PUD application. The Commission specifically agreed with findings by the DMPED that the PUD site "allows for both the development of housing AND the opportunity to provide improved urban park land in perpetuity," to wit, a "first-class urban park of approximately one acre."[16] We are satisfied that the Commission provided a sufficient explanation of its reasoning: it accepted the one-acre-in-perpetuity park as an acceptable trade-off for the larger, temporary park.[17] The fact that the Commission did not specifically

---

[16] Individual commissioners (including the Commission Vice-Chair, who stated that he had played on the current park's "dead-spot tennis courts"), too, remarked that the impact would also be a park that is not "just . . . temporary," and that is "better" though "not as big."

[17] The Commission noted a statement by DMPED that preservation of "half of the site as a park" "would allow all of the site's current uses including courts, playground, and garden, to be brought back to the site." Petitioners assert that there is no basis for that forecast, and one opponent of the PUD told the Commission during the December 5, 2016, Commission hearing that the existing park has elements that "cannot be squeezed into an acre." But the record does not establish what acreage of the current park is devoted to these purposes rather than uses such as "associated surface parking" (i.e., what petitioners describe as a "small parking lot"). Nor does the record establish what portion of the current park is needed for current uses by area residents, including seniors and immune-compromised individuals, who rely on the park to meet their mental or physical health needs. Thus, petitioners have not met their "burden of demonstrating error" in the Commission's reliance on the DMPED forecast about allowing current uses to return to the site. *Union Mkt. Neighbors*, 197 A.3d at 1068. Further, the

mention, in its list of adverse effects, petitioners' contentions about the current park as the centerpiece of the neighborhood is not a basis for reversal, because the Commission's recognition of what will be the diminished size of the park as a trade-off for a park in perpetuity "may reasonably be discerned," *FOMP III*, 211 A.3d at 149, and its approach reflects the balancing it was required to undertake.

Petitioners emphasize that developing new affordable housing on the Bruce Monroe site at the expense of losing current park space is not the "only feasible way," and they see a "smoking gun" in the fact that there are "many alternative

---

Commission was not required to accept at face value drawings that (in petitioners' words) show a park that is a "glorified front yard" for the 90-foot building when the District represented to the Commission that it will "engag[e] the community to receive feedback on proposed park plans."

Petitioners also fault the Commission for its reference to the statement that the PUD proposal would preserve "half" of the Bruce Monroe site as a park, when in fact that proposal is to reduce the park from 121,831 square feet to 43,783 square feet.  Petitioners assert that the Commission's "failure to understand and accurately weigh the PUD's adverse effect on the size and functions of an amenity relied on by [p]etitioners and the community contributed to a larger failure when balancing harms vs. benefits."  But, again, the reference to preserving half the park was a quote from a letter from the Deputy Mayor for Planning and Economic Development. The Commission understood that the preserved portion of the park would be an approximately "44,000 square foot parcel."  The discrepancy is not a basis for reversal, because there is no "substantial doubt [about] whether the agency would have made the same ultimate finding with the error removed." *Arthur v. D.C. Nurses' Examining Bd.*, 459 A.2d 141, 146 (D.C. 1983).

sites," including privately owned parcels, where new housing could be built. But, as noted above, the Commission recognized that the proposed PUD will leverage the value of District-owned land to subsidize affordable housing, and it cited with approval DMPED's observation that using public land for the creation of affordable housing "is one of the most effective strategies a municipality can use to leverage the creation and preservation of affordable housing."

In any event, to approve the PUD application, the Commission was not required to find that there are no feasible alternatives to the proposed project site.[18] *See Barry Farm*, 182 A.3d at 1225 ("[T]he Commission is not charged with evaluating all possible alternatives."); *Spring Valley-Wesley Heights Citizens Ass'n v. D.C. Zoning Comm'n*, 88 A.3d 697, 715 (D.C. 2013) *as amended* (Mar. 27, 2014) ("It was not the function of the Commission to consider all the possible alternatives to development of the East Campus[.]"). Nor—unlike with respect to the proposed destruction of a historic landmark[19] or the proposed demolition of a structure that the Comprehensive Plan designates as an object of "special care"[20]—

---

[18] As the applicant argues, it was not the Commission's place to reject decisions made by the Council and the Mayor respecting the use of the site.

[19] *See FOMP I*, 149 A.3d at 1042 (citing D.C. Code §§ 6-1102(10), 1104(e), 1106(e)).

[20] *Durant*, 99 A.3d at 261. Thus, petitioners are incorrect that for the Commission to approve a PUD that "pit[s] two important Comprehensive Plan

does the law require a showing that a PUD is necessary in the public interest, or is necessary to avoid economic hardship, or is the only feasible way to advance other important policies. We reject petitioners' argument that the Commission was legally precluded from proceeding to a balancing-of-interests analysis. The Commission properly proceeded to an analysis of whether "to allow more intensive development" on the site, "in exchange for . . . public benefits which would not be provided if *the site* were developed under matter-of-right zoning." *Beloved Cmty. Alliance*, 284 A.3d at 732 (emphasis added). As Advisory Neighborhood Council 1A noted in its post-remand comments to the Commission, and as the applicant notes in its brief, the entire site could accommodate the planned number of housing units through matter-of-right development without the requested zoning relief, but that alternative would require the use of the entire site and the complete removal of the park.[21]

---

priorities against each other, a proposal must be 'the only feasible way' to achieve one priority."

[21] The Commission also noted OP's similar analysis stating that "[i]f the [ninety-foot] building were to be lower, it would also be more squat with a larger footprint which would impinge on the size of the park." We again conclude, as we did in *Cummins*, that the Commission "adequately grounded . . . in substantial evidence" its "finding that the PUD's proposed building heights and density were necessary to achieve the affordable-housing goals of the project," 229 A.3d at 782, while preserving approximately 44,000 square feet of the Bruce Monroe site as permanent park space.Petitioners note the discrepancy between the "minimum of

Petitioners next argue that the Commission failed to discuss adverse impacts through a racial equity lens. We note first that the amendments to the Comprehensive Plan requiring use of a racial equity lens became effective after the Commission's initial decision, and the Commission evaluated the PUD under the Comprehensive Plan in effect at the time the PUD application was filed.[22] The Commission was not required to conduct a "standalone racial equity analysis" and *a fortiori* was not required to do an analysis of the type urged by a commenter that the Commission must address "basic questions" such as "[w]hat are the current systemic racial inequities facing the community and surrounding communities?" in order to approve the PUD.[23]

---

44,000 square feet of land" for a park specified in the PUD application and a surveyor's report showing only 43,783 square feet of land in the portion of the Bruce Monroe site designation for preservation as a park. However, they do not suggest that this is a basis for vacating the Order on Remand, and we do not discern it to be such.

[22] "The Comprehensive Amendment Act of 2017 amended the framework element, and was effective August 27, 2020, as D.C. Law 23-217; and the Comprehensive Plan Amendment Act of 2020 amended the text of the Comprehensive Plan and its Future Land Use Map, and was effective on August 21, 2021, as D.C. Law 24-20." 69 D.C. Reg. 8325, 8326 (Jul. 8, 2022).

[23] But even under the Comprehensive Plan that was in effect at the time of the PUD application, the Commission was required to recognize that "the production of new affordable housing [is] essential to avoid a deepening of racial and economic divides in the city." 10-A D.C.M.R. § 218.3.

That said, the record refutes any suggestion that the Commission failed to consider racial equity in assessing the impact of the proposed PUD. In determining that approval of the PUD would "advance racial equity," the Commission specifically cited data about "the significant disparities in housing need, access, and opportunity when Black and Hispanic District residents are compared to whites." The Commission agreed with OP that "[o]ne of the key ways the Comprehensive Plan seeks to address equity is by supporting additional housing development" that will counter the "imbalance between supply and demand" that drives up housing prices and creates "challenges for many residents, particularly low-income residents." The Commission agreed with OP's conclusion that in light of the "socio-economic composition of the District in general" and the mixed-income community and diverse housing options the PUD will create, the PUD will "help provide access to residential units for residents of color." The Commission also cited, as factors promoting racial equity, the applicant's commitment to reserve more than half of the project's new job hires and nearly a third of apprenticeship hours for District residents and a commitment of thirty-five percent subcontracting to certified small business enterprises.[24] The Commission

_____

[24] The Zoning Commission Chair saw the PUD with its affordable housing as a "shining example of giving people an opportunity of all walks of life" to stay in a community with ample access to transportation, an observation that is

specifically acknowledged the racial equity issues raised by persons opposing the application, but found the foregoing benefits to be consistent rather than inconsistent with the Comprehensive Plan requirement that land use policies provide access to services and opportunities within neighborhoods of color and low-income communities. The Commission further found that the data and tools that OP used in its evaluation of the PUD were "more persuasive than . . . [the] 'racial equity tool'" suggested by an opponent of the PUD proposal. And, in response to a question about how the Commission would "address racial equity if there's no guaranteed home ownership," the Commission was advised by counsel for the applicant and by OP that the project includes "flexibility to make some of the townhomes rental or for sale" and thus there is "potential for home ownership as it relates to the townhomes in the southwestern portion of the site."

Petitioners also raise a number of arguments that were not timely raised before the Commission. They argue that the Commission did not consider adverse impacts related to the COVID-19 pandemic. But the pandemic arose after the Commission's initial order (and the public health emergency has now ended), and

consistent with the amended Comprehensive Plan's focus on addressing issues of equity in housing, transportation, and employment, with the goal that "race no longer determines one's socioeconomic outcomes."

the Commission was not required to consider it on remand. Petitioners also assert that the Commission "admits drinking water would be adversely impacted" by the project and did not address how that asserted adverse impact could be mitigated or rendered acceptable. However, we see no such "admission" in the record,[25] and in the absence of "contrary evidence requiring greater specificity"[26] in the Commission's analysis, we conclude that the Commission adequately considered adverse environmental impacts.

Petitioners further argue that the Commission failed to address the impact of the PUD on families who live or lived in the Park Morton public housing complex (which was slated for demolition and replacement by the PUD). The Commission acknowledged the displacement of some Park Morton residents "while [the] appeal process has played out" but stated that this did not occur as a result of the original approval of the PUD application. The Commission also acknowledged the preference of some Park Morton families for lower-density development and larger bedrooms than the project will provide, but reiterated its findings that the project is not inconsistent with the Comprehensive Plan taken as a whole or with racial equity. We discern no basis for questioning either conclusion.

―――――――――――

[25] In his testimony, petitioner Poe did refer to "century old water mains."

[26] *FOMP III*, 211 A.3d at 150.

**D. Approval of the PUD**

We required the Commission on remand to "determine whether, in light of the Commission's conclusions on the[] issues [to be addressed on remand], the Commission should grant or deny approval of the PUD" and to "explain the Commission's reasoning in granting or denying approval." *Cummins*, 229 A.3d at 781. The Commission explained in its Order on Remand that it would again grant the application because the PUD's benefits "more than outweigh the relief requested and the potential adverse effects of the Project that are not otherwise favorable or adequately mitigated" and that the "potentially inconsistent Comprehensive Plan policies" and any "inconsistency with the policy guidance of the NCA" and the GPM, "are greatly outweighed by the policies that support approval." The Commission found that "the PUD is not inconsistent with the GPM, notwithstanding the NCA inconsistency, when all of the relevant GPM policy guidance is considered as a whole."

Petitioners find fault with the Commission's balancing of benefits and adverse effects. They contend that the Commission's balancing of the PUD's benefits and adverse impacts is flawed because the Commission did not adequately identify "the scale, gravity, or weight" of each adverse impact. We are not persuaded by this argument. To the extent petitioners suggest that the Commission was required to assign a numerical weight to each benefit or adverse effect, or to

quantify each, we reject the suggestion. As we have previously recognized, "the environmental, social, and other public benefits of a project 'do not always lend themselves to direct measurement.'" *Wheatley v. D.C. Zoning Comm'n*, 229 A.3d 754, 762 n.5 (D.C. 2020) (quoting *California v. Watt*, 668 F.2d 1290, 1317 (D.C. Cir. 1981)); *see also, e.g.*, *Union Mkt. Neighbors*, 197 A.3d at 1069 (concluding that the Commission had "judged, balanced, and reconciled the relative values of the project amenities and public benefits offered . . . and any potential adverse effects," where "[i]n response to ANC concerns about how [a] . . . proposed eleven-story hotel would interact with [the neighborhood's] lower-scale buildings," the Commission found that the project design "soften[ed]" the project's impact on the neighborhood through "installation of a green wall of various textures and hues combined with planting greenery on th[e] south elevation"). "Generally speaking, if we can discern 'with reasonable clarity' the 'reasons for the decision,' the agency has fulfilled its duty of explanation." *Spring Valley-Wesley Heights Citizens Ass'n*, 88 A.3d at 705 (quoting *Dietrich v. D.C. Bd. of Zoning Adjustment*, 293 A.2d 470, 472-73 (D.C. 1972)). That is the case here.

Petitioners also argue that some of the mitigations the Commission recognized "are inconsequential, disregard the existing community, are conclusions unsupported by the evidence, and are at cross purposes with each

other."[27]  Petitioners focus, for example, on TDM items such as pre-loaded Metro

Smart trip cards and a supply of shopping carts.  Even if it is not reasonable to

think that any one of these items will sufficiently mitigate the adverse impact of

the PUD on traffic, to the extent that their availability induces residents sometimes

to substitute public transit use or pedestrian errands for some automobile trips, it

seems reasonable to predict that they could contribute to the result the applicant's

transportation expert forecasted: a negligible impact on traffic.  The petitioners

offered no contrary analysis of traffic impact, and we are satisfied that the

Commission could reasonably rely on the results of the traffic impact study.

Nor did the Commission disregard the existing community, because it relied

on an assessment that current uses of the Bruce Monroe park could continue on the

preserved parkland, "including courts, [a] playground, and [a] garden."  As for

petitioners' claims about cross-purposes, petitioners have not shown that the

availability of underground parking in the proposed buildings will inevitably work

---

[27] Petitioners contend that the Commission "double count[ed]" items as both a project benefit and a mitigation of adverse impacts.  This is not improper, however, because the zoning regulations expressly recognize that measures that mitigate adverse effects may themselves be public benefits.  *See* 11 D.C.M.R. § 2403.9 (2013) (noting that a public benefit includes "[e]ffective and safe vehicular and pedestrian access, transportation management measures, connections to public transit service, and other measures to *mitigate* adverse traffic impacts" (emphasis added)).

against use of public transportation, bicycles, or walking where these modes of transportation are located nearby or are otherwise made convenient.

With respect to the balancing of benefits and adverse effects, petitioners are correct that the "build-first" benefits of the PUD, which would have enabled residents of the Park Morton public housing complex to be displaced only once, were lost to many Park Morton residents because their move-outs proceeded while the PUD was stalled. But the Commission found "persuasive" the evidence that the Bruce Monroe PUD site "remains an integral component to providing replacement units for Park Morton residents" and will "allow former Park Morton residents . . . an opportunity to return to their neighborhood" (and thus to "existing social support networks"[28]). The Commission could still reasonably regard the PUD's addition of "necessary replacement public housing units in a mixed income community" as a public benefit weighing heavily in favor of approval of the PUD application, and (contrary to arguments petitioners made in the motion for reconsideration of the Order on Remand) the Commission was not required to regard the fact that the PUD site will no longer serve as a build-first site as an adverse impact of the PUD.

---

[28] *Barry Farm*, 182 A.3d at 1227.

## IV.

In sum, we are satisfied that the Commission's analyses were reasonable, that the Commission adequately explained its decision to grant the PUD application, and that the decision is supported by substantial evidence.  For those and all the foregoing reasons, the Commission's order is

*Affirmed*.